## GODFREY *v.* TERRY.

The Merchants' Bank of South Carolina, at Cheraw, suspended specie payments Nov. 13, 1860, and never thereafter resumed. Its charter contains a provision that, "in case of the failure of the said bank, each stockholder, copartnership, or body politic, having a share or shares in the said bank at the time of such failure, or who shall have been interested therein at any time within twelve months previous to such failure, shall be liable and held bound individually for any sum not exceeding twice the amount of his, her, or their share or shares." To enforce this provision, A., Dec. 2, 1870, filed, for himself and other note-holders, a bill in the Circuit Court, against the receiver of the bank, its cashier, five of its directors, and some sixty others, as stockholders, alleging, among other matters, that he was a citizen of Virginia, but making no averment touching the citizenship of the other note-holders or of the defendants. Such citizenship does not appear by the record, and the bank was not made a party. Twenty of the defendants were served with process, and the others did not enter an appearance. Dec. 15, 1874, a final decree was rendered, which, after declaring that the persons who held shares of stock in said bank "on the first day of the month of March, A.D. 1865; or who were interested therein within twelve months previous to said first day of March, 1865, are liable and are held bound individually to the complainants, for a sum not exceeding twice the amount of the share or shares held by said stockholders respectively," and reciting the names of over sixty of such stockholders, the number of shares held by each, and the amount for which each was liable, together with the names of five bill-holders, in addition to A., and the amount due to each of them, awards judgment and execution against the defendants, stockholders, as aforesaid, for the amount due said bill-holders respectively, besides costs. *Held*, 1. That the citizenship of the parties is not sufficiently shown to give the court below jurisdiction; and, were it otherwise, the decree is erroneous, in that it was taken against parties not served, and against the defendants jointly, while a several liability was imposed by the charter upon each stockholder, not to exceed twice the amount of his shares. 2. That, within the meaning of its charter, the bank failed Nov. 13, 1860. 3. That a suit against a person who was a stockholder at that date, or within twelve months prior thereto, was, when this suit was commenced, barred by the Statute of Limitations.

APPEAL from the Circuit Court of the United States for the District of South Carolina.

The facts are stated in the opinion of the court.

*Mr. Theodore G. Barker* and *Mr. James. Lowndes* for the appellants.

*Mr. D. H. Chamberlain* and *Mr. Harvey Terry*, contra.

MR. JUSTICE MILLER delivered the opinion of the court.

The Merchants' Bank of South Carolina, at Cheraw, was

chartered in 1833, and the charter was renewed for twenty years in 1852. Both statutes provided that, "in case of the failure of the said bank, each stockholder, copartnership, or body politic, having a share or shares in the said bank at the time of such failure, or who shall have been interested therein at any time within twelve months previous to such failure, shall be liable and held bound individually for any sum not exceeding twice the amount of his, her, or their share or shares."

In December, 1870, Harvey Terry filed a bill in equity, in the Circuit Court of the United States for the District of South Carolina, to enforce this provision as to certain bills of the bank, of which he claimed to be the holder and owner. He alleges himself to be a citizen of the State of Virginia; and he prays for subpœna against William Godfrey, receiver of the bank, John Mattison, cashier, and five others, as directors of the bank, and some sixty others, as stockholders. The bank is not made a party, and no allegation is found in the bill, or anywhere else in the record, of the citizenship of any of the defendants. Of the persons made defendants by the bill, service was only obtained upon twenty, and no appearance was made for any one else.

The bill charges, among other matters, " that on the first day of March, A.D. 1865, and, indeed, at an earlier date, the said bank had failed, being then indebted to an amount far exceeding its assets; and that, in consequence of such failure, in accordance with the provisions of the said act, the stockholders, copartnerships, and bodies politic, holding shares in said bank, or who had been interested therein within twelve months previous to such failure, became liable for the debts of the said bank for sums not exceeding twice the amount of the shares held by them respectively."

And it was alleged that, under statutes of the State of South Carolina enacted for that purpose, the bank and all its property were, by the proper State court, placed in the hands of William Godfrey as receiver, who was then in charge of the same. It then prays for an account of the assets, furnishes a schedule of the stockholders, which plaintiff says is the best he can obtain, and calls for a discovery of the names of all who were stockholders at the date of the failure, and for twelve months

next preceding that date, and that, when ascertained, they may be made defendants, and charged with liability for his debt against the bank.

Answers were filed for all, or nearly all, who were served; but no replications to any of these answers are found in the record.

The answers generally set up a plea of the four years' statute of limitation. Several of the answers aver that the failure of the bank took place Nov. 13, 1860, when this bank, in common with all the banks of South Carolina, suspended specie payment of their obligations, and never afterwards resumed.

The only answers which admit the ownership of shares in the bank, and fix the time of said ownership, are the separate answers of A. Baxter Springs and R. A. Springs, each of whom admits that he held sixty shares of the bank in 1854, and has held the same ever since.

In December, 1872, the court made an order of reference to a master, with instructions to ascertain and report who were stockholders in the bank on the first day of March, 1865, and for twelve months previous thereto, and how many shares they held; also, to ascertain and report who were the creditors and bill-holders of the bank, and the amount due to them respectively.

This order, it will be seen, fixed the day of the failure of the bank at March 1, 1865. What evidence was before the court, or whether there was any, of the date of failure, the record does not show, except the following agreed statement of facts, which, as far as they show any thing on that subject, support the allegations of the answers, that the failure occurred in November, 1860: —

"In this case, the following facts are agreed to by counsel in the cause, and to be considered as testimony in the same before the court: —

"1. The Merchants' Bank of South Carolina, at Cheraw, suspended specie payments at the same time with the other banks in the State; was so suspended in November, 1860, and never after resumed specie payments.

"2. The said bank ceased to pay out its bills as soon as the Con-

federate currency began to circulate. The last time at which any of its bills were paid out was on the 6th of August, 1861.

"3. In his regular business as banker and broker, the complainant, Harvey Terry, bought the notes and bills of the said Merchants' Bank of South Carolina, as proved by him in this case, amounting to over $20,000, at prices ranging from twenty cents to five cents on the dollar of their face value. Most of these purchases were made in 1868 and 1869, at about fifteen cents on the dollar.

"4. That the Circuit Court of the United States for the District of South Carolina was held in Charleston, on the twelfth day of June, A.D. 1866."

The order, however, was binding on the master, and the date fixed by it controlled his action and all subsequent proceedings in the case. The master reported that there were sixty-four shareholders liable for various sums, taking the date of the failure mentioned in the order, and giving their names; that Harvey Terry, the plaintiff, was a creditor of the bank, on account of its circulating notes held by him, to the amount of $28,040.36, and Simonton and Barker to the amount of $26,760, and four other persons, whose claims in the aggregate were about $500.

The court made a final decree, which, reciting the names of the stockholders and the sums for which each of them was liable, says, " It is further ordered, adjudged, and decreed that the clerk of this court do enter up judgment for complainants to the amounts of their respective bills proven in this cause, as hereinafter stated." The names of the creditors and the sums due each of them is then stated, and the decree closes as follows : " And it is ordered that said bill-holders respectively have execution against said defendants, stockholders above named, for the several amounts above stated, and costs. It is further ordered that as to the defendant, Richard Lathers, the bill be dismissed with costs."

This whole proceeding is a very extraordinary one. It is a case in which, if the Circuit Court of the United States had any jurisdiction at all, it must have been on the ground of the citizenship of the parties. But the only allegation or evidence in the whole record on that subject is that plaintiff, Terry, is a

citizen of the State of Virginia. What is the citizenship of five or six other parties, who by the decree are called complainants and bill-holders, and who are awarded execution for their debts against sixty-four defendants, we are not informed. Nor is there a word said about the citizenship of any of the defendants. Upon what principle the court could entertain jurisdiction, and proceed to decree in the case, we are utterly at a loss to understand. If the bank had been a party, its citizenship might possibly have been inferred. But it was not made a party; and a decree was rendered against the defendants, by reason of an obligation which the statute imposes upon them. The court clearly had no jurisdiction of the case.

But suppose it had jurisdiction of the case as to the defendants who were served with process or who appeared. There were only twenty out of the sixty-four individuals against whom the decree was rendered who were served with process, or who appeared in any stage of the proceeding. As to the other forty-four persons against whom this decree is rendered, they have had no day in court, and were served with no process.

The master seems to have called before him a cashier or clerk of the bank, and obtained from him a list of the stockholders, whose names and the number of shares held by each he reported to the court; and on this the court rendered a decree against them. It is impossible to sustain such a decree, if it was shown they were all citizens of the State of South Carolina. The liability of each one of these stockholders, if liable at all, is his several liability. It is a liability depending upon the statutory contract. It depends on the fact of the failure of the bank, and on his holding shares in the bank when it failed, or within twelve months before its failure. His liability depends in every instance on facts peculiar to his own case; for, if the failure of the bank and the date of the failure may be common to all parties charged, it still remains that the ownership of shares, the number of shares, and the time when they were owned, are facts to be established against each man charged, and with which no other defendant has any connection. And in regard to which, if a *prima facie* case is made, each man may have a distinct defence depending on different testimony. These remarks are not made with a view of show-

ing that the stockholders must each be sued in a different action, but to show what is one of the most elementary principles of the law, — that no judgment can be rendered against a man who is not brought within the jurisdiction of the court, because somebody else is on a similar liability.

If, however, we examine the decree on the basis that relief in this action could be afforded to each creditor against the stockholders named, we do not think the present decree can be supported.

The first relief granted by it is, that " it is ordered that the clerk of this court do enter up judgment for the complainants to the amounts of their respective bills proven in this cause, as hereinafter stated."

Was any such judgment ever entered up? If so, it is not found in the record. Was it intended that any judgment except this decree should be entered? No necessity for it is to be seen. Who are the complainants that are to have this judgment? There is but one man named in the bill, or named anywhere else, as complainant.

But treating this as surplusage, the real relief granted is that in the close of the decree, in which it is ordered that the billholders respectively have execution against the stockholders for the amounts found due them. Six executions, to be issued against the same parties on the same liability, in a chancery decree. How are they to be enforced?

One of the stockholders, Allan McFarlan, is held liable for $100,000. He is not served with process, did not make any appearance, may reside in another State. Is all the money due to all the creditors to be made out of him, if his property can be found in the State? If so, what remedy has he against the others? Must he begin a new suit? Must he get another execution against all the others, by another proceeding in this suit?

If there is any reason why this suit should be sustained in chancery instead of a separate suit at law against each stockholder, it is that the burden may be equalized and properly distributed as to the shareholders, and the benefits among the creditors. This decree does nothing of the kind. It leaves the marshal of the court to collect the whole of each execution out

of one man, out of two men, out of ten men, as he pleases.   It may be asked, How can this be avoided?   The answer is easy. It was no trouble to take the sum due to each creditor and the sums due from each stockholder, give a decree *nisi* with time for each man to pay the sum assessed.   Against such as did not pay let execution issue; and if *nulla bona* was returned, there must be a new assessment against the others until all should be paid or the sum of the several liabilities exhausted.   On the other hand, the whole benefit of the chancery remedy, namely, the power to do justice to all by equalizing and properly distributing the relief and the burden, was not exercised by this decree.   *Pollard* v. *Bailey*, 20 Wall. 520; *Hornor* v. *Henning et al.*, 93 U. S. 228.

But there is a well-founded objection to the decree, which is fatal to the relief sought by the bill under any circumstances.

We are of opinion that the court erred in fixing the date of the failure of the bank at March 1, 1865.   On looking into this record to discover on what evidence the court fixed that date, we find that there was none at all.   No evidence on this subject or any other was taken, at least none is found in the record prior to the order of the court referring the case to the master. That order fixed the first day of March, 1865, as the day of failure, and peremptorily directed the master to ascertain and report who were liable as stockholders, with reference solely to that date.   The bill alleges that on that day, " and, indeed, at an earlier day, the bank had failed."   The answer of every defendant who did answer says the bank failed in 1860.   On what evidence, then, did the court, in its order of reference, fix that as the date of the failure?   There is literally none in the record.

It is true that the master reports that in his examination of one or two witnesses " the fact was elicited that the bank failed on or about the first day of March, A.D. 1865."   But this matter was not referred to him.   He had no right to decide it, or to take testimony about it, or to report upon it.   Exception was taken to this part of the report on the ground that the evidence showed that the bank suspended specie payments in November, 1860, and never afterwards resumed, and that

there was no other evidence by which the date of actual failure could be determined.

The evidence which he reports on that subject is that of the receiver and cashier, who stated that the bank finally closed March 1, 1865, though both state their belief that it was insolvent for some time before. All this, however, was improper testimony, because that issue had been decided by the court, and was not open before the master. Neither plaintiff nor defendant had any right to give evidence before him on that subject.

But there is evidence in the agreed statement of facts, not filed before the master, but in the open court, which we have already set forth, that the bank failed on the 13th of November, 1860, and never after resumed; that on that day it suspended specie payments, and never afterwards paid; that the last time it paid out any of its own bills was Aug. 6, 1861; after that it only paid its debts, whether due to depositors or holders of its bills, in Confederate money. What is meant by "failure of the bank," in the clause of its charter which makes the stockholders liable? If a partnership engaged in any mercantile or manufacturing business fails to meet, and pay when demanded, its current business paper as it falls due, that firm is said, in popular language, to have failed. And unless it compromises with its creditors, or makes arrangement for extension of time, it has failed in all senses of the word. If it continues to dishonor its paper, it has failed. If any business man or business firm does the same thing, they are, by the express terms of every bankrupt law, bankrupts. By the bankrupt law of England and of the United States, and by the insolvency laws of Massachusetts and many other States, the person or the partnership in business which is no longer able to pay its current debts as they fall due is insolvent. Here, then, in all these instances, what the bank at Cheraw did is called in others bankruptcy, insolvency, failure. Why is it not so with regard to a bank? If there be any difference, it should be in favor of the rule which brings into action the remedies for bank failures. They are more trusted than individuals; their functions are more important; their failures more disastrous to those who deal with them.

It is argued that the suspension of specie payments in 1860, by the banks of South Carolina, was legalized by her legislature.  The legislature did no more, and could do no more, than to relieve them from the penalty of the forfeitures of their charters.  It could not relieve them from the obligation to pay their debts in specie, nor extend the time for such payment.  It could not do this, because any such law would impair the obligation of the creditor's contract.  It could say: We won't forfeit your charter; we won't close your door; we won't prevent you from doing business if any one will trust you.  But it could not and did not say, We relieve you from the obligation to pay your existing debts.  If they did not pay them, they failed.  What are the principal functions of a bank?  They are: 1, To receive and pay deposits; 2, to issue notes of circulation redeemable on presentation at its counter; 3, to buy and sell exchange; and, 4, to loan money.  Now, of these functions the first two are, as to the public, by far the most important; and as to these the bank at Cheraw failed emphatically in 1860, and never resumed.  That is to say, it failed to pay the deposits then held, or the circulating notes it had then out, according to its legal obligations to do so.  It was not able to do so, and therefore was insolvent.  It did not do so, and was therefore bankrupt.  It refused to do so, and therefore it had failed.

If this bank had resumed payment shortly after the suspension, and had paid or offered to pay all its indebtedness in specie, there would have been no question of the liability of stockholders, nor any question of failure.  But since it never did pay or offer to pay these obligations, since it was never after this able to pay these obligations, it was ever afterwards insolvent, and its failure must bear date of this first and continued refusal and inability to pay.

Although a provision similar to this had been in the charter of the Bank of South Carolina for over seventy years, no decision by her highest court of the question has been made.  We are referred to decisions which determine under what circumstances a bank has forfeited its charter; but they have nothing to do with this question.  The liability of the stockholder does not depend on forfeiture of the charter.  It is a right given to

the creditor of the bank against its stockholders whenever it fails. The duties of the bank to the State depend on other principles, and are within the subsequent control of the legislature. The right of the creditor is beyond its control altogether.

Counsel for appellee furnishes an analysis of the statutory provisions similar to the one under consideration as found in the charters of South Carolina banks from 1801 to the one before us, and insists that the words " bankruptcy " and " failure " were used together and as synonymous until about the time of the charter of the Cheraw bank, when the word " failure " alone was used. But when both words were used, the reasonable inference is that both failure and bankruptcy were required to fix the liability of the stockholder, and when the word " bankruptcy " was dropped, it implied that failure alone was sufficient for that purpose.

But if failure meant bankruptcy, it must mean such a failure as would authorize proceedings in bankruptcy where a bankrupt law existed.

We have already seen that what the bank did in November, 1860, would have been an act of bankruptcy in an individual.

We are of opinion, then, that the bank failed, within the meaning of the clause of its charter, in November, 1860. It follows that only those who were then shareholders, or who had been within twelve months before, are liable, or could be liable, in this suit. We are further of opinion that as to those who were then stockholders the Statute of Limitation is a perfect bar, and no action can be maintained against them.

*Decree reversed, and cause remanded with directions to dismiss the bill.*

MR. CHIEF JUSTICE WAITE, with whom concurred MR. JUSTICE STRONG and MR. JUSTICE BRADLEY, dissenting.

I concur in the judgment of reversal, but do not think that the bill should be dismissed. In my opinion, the suspension of specie payments in 1860 was not a failure of the bank, within the meaning of that term as used in the charter ; and there is, to my mind, no satisfactory evidence fixing the date of the actual failure earlier than March 1, 1865.