KATIE D. KAHMANN ET AL., APPELLANTS, v. O. H. MOBERLY, COMMISSIONER OF FINANCE, RESPONDENT.—77 S. W. (2d) 858.

Kansas City Court of Appeals. January 7, 1935.

*Arnold Conrad* and *Elmer B. Silvers* for appellants.

*Haysler A. Pogue* and *Floyd A. Sperry* for respondent.

TRIMBLE, J.—The question litigated herein is whether plaintiffs as the holders of a time certificate of deposit in the defendant bank for $700. (which matured on January 9, 1933), and one year's interest at four per cent, are entitled to a preference thereon, amounting to $728 on February 1, 1933, when they demanded, on that date, payment thereof, which was refused?

After trial, the court on the third day of February, 1934, denied plaintiffs' claim for preference and ordered it classified as a general claim to be paid proratably with the common claims allowed. Whereupon, plaintiffs duly appealed.

The record discloses that when said time certificate of deposit was due, and between January 9 and February 1, 1933, plaintiffs presented said certificate to the bank, and demanded payment thereof which was refused.

Over the objections and exceptions of plaintiff, evidence was introduced showing that on November 21, 1932, the board of directors of said bank adopted a resolution that "a limit of ten dollars per day be placed on all withdrawals of deposits beginning Tuesday morning, November 22, 1932, this action being deemed advisable in order to protect the funds of this institution for the benefit of all depositors," and after that date the bank put a limit of $10 a day on each account, that is to say, the bank refused to pay any check over $10.

It further was shown in evidence that on January 20, 1933, the cash on hand in the bank was $5447.41 and the "reserve" was $9,-612.50; that on January 27, 1933, the cash was $5443.81 and the reserve $7275.47; on January 28th, the cash was $3286.86 reserve $7563.19; and on February 6th, cash was $15.15 and the reserve was $11,582.66. On redirect examination this witness, the cashier or assistant cashier, said the amount of cash on hand January 7th was $4,041.07 and reserve was $6588.75.

Prior to, and during the period of January, 1933, and continuing up until February 6, 1933, the bank was open for business, receiving deposits and paying checks, which, however, after November 22nd, were limited to those under $10 as heretofore stated, but refusing to pay any checks in excess of that sum. The officers and employees were paid their salaries, or at least a part thereof, and the bank officials were in sole charge of the bank.

Late in the afternoon of Saturday, February 4, 1933, the board of directors of said bank adopted a resolution authorizing its president to notify the Commissioner of Finance to send his examiner to take charge of the bank and it was thereby ordered that the bank be turned over to said Commissioner of Finance, and on Monday morning, February 6, 1933, the bank was, as found by the court, placed in the hands of the Commissioner of Finance of the State of Missouri.

The trial court filed a written finding of facts, which among other things, stated that the court found:

That the bank on November 22nd and 23rd accepted deposits "but refused to permit the withdrawal from any account of a sum in excess of $10;" that a number of checks were refused which were presented for payment on November 22nd or 23rd; and that a copy of the resolution of the board of November 21st placing a limit of $10 on checks, was affixed to checks so refused, and a copy of said resolution was posted conspicuously in said bank;

That on November 24th an entry, signed by H. P. Faris and G. C. Lingle (president and cashier, respectively), was made on the minute book of said bank to the effect that they join the other members of the board "in passing a resolution, calling for and declaring a moratorium thirty days, or failing to get the city council of Clinton, Missouri, to order said moratorium, to vote to close the doors of said trust company, and turn it over to· the honorable Commissioner of Finance."

The trial court also found that on November 24th, the board, at a called meeting at which all members were present, adopted a resolution requesting "the mayor and city council of Clinton, Missouri, to declare a thirty day holiday or moratorium on banking business in Clinton, Missouri. In case it is necessary to ask for any extension of said moratorium authority, authority is hereby given to any officer of the bank to ask for same."

That "from November 22, 1932, to February 6, 1933, being the date on which it appears from the evidence the said bank was placed in the hands of the Commissioner of Finance of the State of Missouri, the said bank did not pay its demands in the due course of business and ·refused to pay checks drawn upon demand deposits in the bank and failed to function as a bank in the proper and ordinary rule and methods of meeting its demands."

The court thereupon found and declared the law to be that:

"The failure and refusal of the officials of the Brinkerhoff-Faris Trust & Saving Company to pay all their demands on November 22, 1932, together with the admission of record by them that action was taken to protect the funds of the institution for the benefit of all the depositors was an act of insolvency under the construction of the Supreme Court of the United States in the case of Godfrey v. Terry, 97 U. S. 179."

"The bank was insolvent by its own act, and that it is unnecessary under the law for it to perform the administrative act in turning its assets over to the Commissioner of Finance to fix the date of insolvency, but it is a question of when the bank through its officials became acquainted with the fact that it could no longer meet its demands in the usual course, and when the directors by resolution refused to meet the demands of the depositors, the bank became insolvent, and the depositors' rights were fixed. If the condition of the bank did not warrant its staying open and paying all of its demands, then it was as a bank insolvent.

"The presentation of checks or demands made by depositors after November 22, 1932, were unnecessary, and that under the law all of the money on deposit in the bank subject to check became due without demand when the bank became insolvent. The stoppage of payment dispensed with the necessity of a demand and all deposits became due and payable forthwith. A demand made by a depositor against the institution was fruitlessly made after November 22, 1932.

"From and after November 22, 1932, the funds belonging to depositors in said bank became and were in effect trust funds in the hands of the officials and directors to be held intact for the benefit of all of the creditors in which they were entitled to share proratably. No checks presented after the public declaration by officials of the bank that checks would not be paid, or presented after officials had recognized in their records the inability of the bank to further meet its demands can be considered as creating preferences."

The record discloses that after the bank, on February 6, 1933, closed its doors and went into the hands of the Commissioner, plaintiffs, in due time, presented their claim to the said Commissioner but it was allowed merely as a common claim. Thereafter, within the time required, plaintiffs filed their petition in the circuit court praying that theirs be classified as a preferred claim.

Neither the bank, nor the Commissioner, filed any answer to their petition, nor, by any pleading, set up a defense thereto.

It is conceded, or at least it is not questioned that when plaintiffs demanded their money, it was due; that payment was refused, and, at the time of such refusal, the bank had ample funds to pay it and (for aught that is shown in the record) enough to pay all checks

presented up to and including the time of plaintiffs' demand of their money. The limitation of $10 on all checks, made November 22nd, was not because the bank did not *then* have money enough to pay checks presented, but because the directors merely *"deemed* it *advisable"* in order to protect the funds for the benefit of all depositors. In other words, the bank voluntarily created a self imposed "moratorium" to the extent mentioned, and later asked the mayor and city council of Clinton to declare a complete moratorium for thirty days, apparently fearing that the bank might *in the future* be unable to pay its obligations. While, at the same time, the bank continued to remain open for business receiving deposits and paying checks which however, as stated before after November 22nd, were limited to checks under $10, and retaining and paying the salaries of its various employees, or at least a part of them. So that at the time plaintiffs demand was made, the bank was *not closed,* had not ceased to do business and was not *entirely* refusing to pay depositors. The record shows that the cash on hand *increased* from $4041.07 on January 7, 1933, to $5447 on January 27, 1933, and the bank was still running, paying salaries to its officers and employees, and the bank was in the sole charge of its officers and directors until the morning of February 6, 1933. The record shows, without dispute, that the demand deposits fluctuated from $262,957.80 on November 23, 1932, to $261,191.18 on January 20, 1933. Then to $260,829.14 on January 27th and to $260,717.38 on January 28, 1933. All this time, and up to and long after plaintiff had made the demand for the money, the bank was open, conducting its business and was "a going concern" within the definition of that phrase given in Alberger v. National Bank of Commerce, 123 Mo. 313, 1. c. 319.

"It is a going concern, in contemplation of law, so long as the property of the company remains in its possession, unaffected by liens or process of law."

The question, however, is, whether the condition of the bank prior to the turning of it over to the State Finance Commissioner, and notwithstanding it remained open and in charge of its officers, receiving and paying certain checks, can, under our present law, deprive the plaintiffs of their right to demand their money, and authorize the bank to refuse payment at a time when it could have paid the time deposit? If the bank cannot, under such circumstances and by such course, deprive the plaintiffs of the benefit of their demand and compel them to take their chances in the future in common with all other creditors when the bank does acknowledge itself bankrupt, then the right to a preference arises by operation of law, the moment the demand was made.

The mere fact that the bank is in such condition that it *may* in the future become insolvent and have to close, has never been held in this State (so far as we have been able to find), to deprive a

depositor of the right to demand his money and prevent him from becoming a preferred creditor if payment is refused him. It would seem that if, at the time the demand is made, the bank is open, and continues thereafter for a time to remain open and transact business, the bank could, of its own volition, deprive the depositor of a *valuable right* to which his industry and diligence and care of his rights have entitled him, and such deprivation, too, would be without consideration and because of no fault or lack of diligence on his part.

The case of Godfrey v. Terry, 97 U. S. 171, 179, cited by the trial court in support of its holding, was a suit against a stockholder on a liability created by a provision in its charter. Again, the bank in that case wholly failed to pay any of its debts after August 6, 1861, the suit was filed December, 1870, and the provision of the charter relied on as creating liability, began with these words, "In case of the failure of the said bank," and hence the remarks of Justice MILLER, at said page 179, apply to the circumstances of that case are not applicable to the question in the case at bar.

The plaintiff had the right to, and did, demand payment not later than February 1, 1933, and the bank was legally bound to pay it then, and could have done so as we have seen. The refusal of the bank to pay converted, out of the assets, the amount of plaintiff's debt into a trust fund for them. If the said fund later passed into the hands of the Commissioner of Finance, it went there impressed with the trust which entitled the owners to a preference. [Bank of Poplar Bluff v. Millspaugh, 313 Mo. 412.] The essentials necessary to create a preference are, (1) right to demand, (2) actual demand, (3) duty to pay funds available to pay, (4) refusal to pay and (5) consequent augmentation of assets in hands of Commissioner. [Claxtor v. Cantley, Commr., 297 S. W. 975; Johnson v. Farmers' Bank of Clarksdale, 11 S. W. (2d) 1090; Hiatt v. Miller Bank, 34 S. W. (2d) 532.] Likewise this is true where the bank fails to obey depositors' instructions. [McPhelen v. Scott County Bank, 64 S. W. (2d) 456.]

Mere insolvency of the bank, even if solvent at time plaintiffs demanded their money, does not prevent a preference, which is created by operation of law. [Turner v. Farmers' Exchange Bank, 45 S. W. (2d) 1084; Ronchetto v. State Bank of Bevier, 5 S. W. (2d) 174.] There being no statute to the contrary, the plaintiffs by their demand were entitled to a preference, under the circumstances of this case; for which the directors of an insolvent bank holds its assets in trust for its creditors; they do not necessarily so hold for the *pro rata* benefit of all creditors alike. [Meyer v. American Folding Chair Co., 130 Mo. 188; Alberger v. National Bank of Commerce, 123 Mo. 313.] Section 5318, Revised Statutes of Missouri, 1929, 11 Mo. St. Ann., p. 7549, does not prevent a depositor from demanding his money and thereby obtaining a right to a preference when-

ever the bank thereafter goes into the hands of the Commissioner and the claims against it are being classified. The above statute merely prohibits the bank from assigning assets to one creditor in preference to others. The purpose of the statute is to prohibit insolvent banks from liquidating their business under the general law in regard to voluntary assignments for the benefit of creditors. [Citizens Trust Co. v. Tindle, 272 Mo. 681.]

Neither the defendant bank, nor its directors, could by the request to the mayor and council of the City of Clinton, declare a so-called "moratorium" nor the attempted granting of such unprecedented request, deprive plaintiffs of their right to demand payment of their matured certificate of deposit nor relieve the bank of its duty to pay when it had money to do so and was still open for business, nor from the consequences of such refusal arising by operation of law. [Commerce Trust Co. v. Farmers' Exchange Bank, 61 S. W. (2d) 928, 930.] The resolution of November 21, 1932, was not the same as turning the bank over to the Commissioner and thereby fix creditors rights. The bank continued to be open and remain in the hands and control of its own officers, and the fluctuation of its cash on hand and in its deposits shows it continued to transact business, of which there is no evidence to the contrary. Under the exclusive statutory method of handling and liquidating insolvent banks, there is nothing for a board of directors to do except to turn the bank over to the Commissioner. No action otherwise by the board, after the depositors' money is due and has been demanded and refused, will stay, modify, or affect, such depositors' rights. To hold otherwise would, it seems, permit a banker to wrongfully refuse to accede to a depositors' rightful demand, and yet at his own sweet will keep the bank open for all other purposes, draw and pay salaries, and, to that extent at least, dissipate assets, and, at the same time, compel his demanding and diligent depositor to take whatever chance the revolving wheel of fortune may turn out to him in the future. We are not willing to give our assent to such procedure. The judgment should, therefore, be reversed and the cause remanded with directions to award the preference. It is so ordered. All concur; *Shain, P. J.*, in separate opinion.

## SEPARATE CONCURRING OPINION.

SHAIN, P. J.—While I concur in the conclusions reached by my associate, who wrote the opinion in this case, on the ground that the case is decided upon the law as it has been heretofore declared by the Supreme and appellate courts of this State, still in the light of past events and in view of future possibilities I desire to give expression that I deem *apropos* to the principle involved.

In matters of preference the equities are involved. Therefore, if the prevailing practices that have characterized banking in the last

few years shall become established as custom and ripen into law then equity must relieve from the harsh mandate of the law as it is now declared.

If executive mandate, or if legislative act, whether state or municipal, can declare a moratorium or if bank officials can restrict payment with authority of law, then to the end that equity may be done, assets should so be impounded by trust as all creditors may share alike.

This court, however, is not in a position to say that the practices referred to has yet ripened into established custom and as equity follows the law we are compelled to concur.