**YORK v. GUARANTY TRUST CO. OF NEW YORK.**

**No. 256.**

Circuit Court of Appeals, Second Circuit.
March 2, 1944.

Rehearing Denied and Opinion Revised
May 25, 1944.

AUGUSTUS N. HAND, Circuit Judge, dissenting.

———◆———

Meyer Abrams, of Chicago, Ill., and Bennett I. Schlessel, of New York City (Shulman, Shulman and Abrams, of Chicago, Ill., of counsel), for appellant.

Davis Polk Wardwell Gardiner & Reed, of New York City (Ralph M. Carson and Francis W. Phillips, both of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. This case is here on appeal from a summary judgment, for the defendant, entered on the pleadings and affidavits. As a consequence some of the highly complicated facts are not entirely clear and the following statement of facts must be read with that in mind. Wherever in this opinion we refer to our conclusions "on the facts now before us" or use similar locutions, it is to be understood that we are not now making any findings, but are merely deciding that the issues of fact should be decided after the trial court hears the evidence on a trial.

Two brothers named Van Sweringen owned 80% of the stock of The Vaness Company (which we shall call Vaness). That company owned all the stock of a Delaware corporation, Van Sweringen Corporation (which we shall call the debtor), and it, in turn, owned all the stock of the Cleveland Terminals Building Company (which we shall call the subsidiary). The record is silent concerning the previous history of these parties, but tells us that on May 1, 1930 (some months after the stock market debacle of 1929) the debtor issued $30,000,000 of notes payable in five years, bearing interest at 6% per annum payable semi-annually. At the time of their issuance, these notes were sold to the public by a syndicate, including the Guaranty Company of New York, a wholly-owned subsidiary of the defendant, Guaranty Trust Company of New York.

The notes were issued under an instrument executed by the debtor and the defendant which described the instrument as a "Trust Indenture" and the defendant as "the trustee." The notes were not made a lien on any assets. The Indenture contained so-called "negative pledge" clauses of a more or less conventional kind. It provided that the debtor would acquire, simultaneously with the issuance of the notes, 500,000 shares of the common stock of Alleghany Corporation which at that time had a market value of $15,000,000. Such shares, and any proceeds thereof, were called "segregated assets." The debtor agreed that, until at least $15,000,000 principal amount of the notes had been retired and cancelled, the debtor would not mortgage, pledge, sell, transfer or otherwise dispose of any of the segregated assets, "except for cash, to be applied by the debtor only for the following purposes: (a) To be held as cash; (b) to retire the notes by purchase or redemption, all notes so retired to be cancelled; (c) to purchase common stock of said Alleghany Corporation; (d) to purchase United States Government obligations; or (e) to purchase and hold uncancelled in its treasury any of the notes." The Indenture provided that, whenever the aggregate value of the "segregated assets" exceeded 50% of the

principal amount of all notes outstanding, the amount of such excess should no longer be subject to such restrictions and might be used by the debtor for its general corporate purposes.

There then followed provisions about which it might be said that the present suit revolves: The Indenture stated that in accordance with an agreement simultaneously executed by the trustee and the Van Sweringen brothers,[1] they agreed that, whenever the value of the "segregated assets" became less than 50% of the principal amount of all notes then outstanding, the Van Sweringens would repair such deficiency by assigning and delivering to the debtor readily marketable securities in an amount sufficient at their then market value to equal the amount of such deficiency. Such securities were referred to as "assigned securities." For the "assigned securities" the debtor was to give the Van Sweringens a non-negotiable obligation which the Van Sweringens were to hold in trust for the benefit of the holders of outstanding notes to the extent that, in the event of a liquidation of the debtor and after full distribution to the holders of the notes, a deficiency in the full payment of the notes and accrued interest thereon might remain, the Van Sweringens would, to meet such deficiency, pay to the trustee for distribution to the noteholders all monies the Van Sweringens received in such liquidation on account of such non-negotiable obligation. Such "assigned securities" (subject to withdrawal provisions described below) were to be available to the creditors of the debtor for application to the payment of the debtor's liabilities; as the defendant construes the instrument, those securities (until such withdrawal) were to be the property of the debtor. The instrument contained these unusual withdrawal provisions: When $15,000,000 of the notes were retired and cancelled, then all obligations of the Van Sweringens should terminate and they were to have the right to withdraw and to have reassigned and delivered to them by the debtor all "assigned securities," on the surrender to the debtor of any obligation theretofore issued to the Van Sweringens therefor. Also, at any time before the debtor's liquidation, any excess in the "assigned securities" was to be withdrawable by the Van Sweringens.[1a]

The Indenture described various "events of default," including, among others, a default in the payment of any installment of interest continuing for thirty days; a default in the provisions as to the "segregated assets" or in the negative pledge clauses;

---

[1] That agreement was executed simultaneously with the Indenture.

[1a] Clause 2 of the agreement between the trustee and the Van Sweringen brothers reads as follows: "2. The Corporation shall deliver to the Van Sweringens in respect of any such assignment and delivery by the Van Sweringens to the Corporation of such readily marketable securities the stock or obligations of the Corporation. In case any such consideration consists of obligations of the Corporation such obligations shall be in non-negotiable form and shall provide that the same shall be held (except as they may be surrendered to the Corporation as hereafter provided) in trust for the benefit of the holders of said notes to the following extent, that in the event of a liquidation of the Corporation and after full distribution to the holders of said notes a deficiency in the full payment of said notes and of all accrued interest thereon remains the Van Sweringens to the extent of such deficiency on said notes pay over to the Trustee for pro-rata distribution to the holders of said notes all moneys received by the Van Sweringens pursuant to such liquidation in payment of or on account of such obligations."

Clause 3, relating to the withdrawal of an excess, begins as follows: "3. All securities so assigned and delivered by the Van Sweringens to the Corporation hereunder shall, until the Van Sweringens shall be entitled to withdraw the same as hereinafter permitted, be available to *creditors* of the Corporation for application to the payment of its indebtedness and liabilities, subject, however, to the following conditions: * * *" (Italics added).

As Clause 2 relates to the rights of noteholders in particular and Clause 3 to the rights of creditors generally, there is some ambiguity in those provisions. At least for purposes of this appeal from a summary judgment, we are inclined to construe them thus: Unless, before the debtor's liquidation, the Van Sweringens had surrendered that part of the non-negotiable obligation of the debtor representing such excess, they could not, after liquidation began, withdraw such an excess until the noteholders were first paid in full.

However, we shall, from time to time below, note the effect of an interpretation which would permit such withdrawal even after the beginning of liquidation.

the appointment of a receiver of the debtor or of the major part of its property, or a judicial declaration that the debtor was bankrupt or insolvent. If any one or more of such events occurred, it was agreed that the trustee "may, and upon the written request of the holders of at least 25% in principal amount of the notes then outstanding, shall, declare the principal of all the notes then outstanding to be due and payable immediately, and upon any such declaration the same shall become and be due and payable immediately, anything in this Indenture or in the notes contained to the contrary notwithstanding." Upon such an acceleration of the maturity of the notes, the debtor was to pay to the trustee the amount due thereon. If it did not do so, then "the trustee, in its own name and as trustee of an express trust" was empowered to institute an action at law or in equity for the amounts thus due and unpaid, to obtain a judgment in such proceedings, and to enforce any such judgment against the debtor. All rights of action under the Indenture or under any of the notes could be enforced by the trustee without possession fo the notes. In the event of any insolvency or bankruptcy of the debtor, the trustee was given power to execute and file proofs of debt on behalf of, and as agent of, the noteholders. The trustee was also given power to institute such proceedings as it might deem necessary or expedient "to prevent any impairment of its rights or the rights of the noteholders by any acts of the" debtor "or of others in violation of the Indenture * * * or deemed by the trustee necessary or expedient to preserve and protect its rights and the rights of the noteholders." No noteholder was to have any right to institute any action under the Indenture or for any remedy thereunder unless the holders of at least 25% of the face amount of the notes then outstanding should first have requested the trustee to act and the trustee, after a reasonable time, failed to do so. It was provided that the trustee should not be liable for anything in connection with the trust "except for its own wilful misconduct"; the Indenture contained other exculpatory clauses which we shall later discuss.

Not long after the issuance of the notes, because of a decline in the market price of Alleghany shares, the Van Sweringens delivered to the debtor, as "assigned securities," 400,000 shares of the Alleghany Corporation.

In October 1930, as the time approached for the payment of the first semi-annual installment on the debtor's notes, it faced serious difficulties. Neither the debtor nor its parent Vaness had funds available to pay that interest. Moreover, because of a further decline in the market value of the Alleghany stock, the value of the 900,000 Alleghany shares, constituting the "segregated assets" and "assigned securities," threatened to sink below $15,000,000, i.e., the requisite 50% of the notes. In order to meet those difficulties and also because of grave financial problems confronting Vaness and the debtor's subsidiary, a group of banks (which we shall call the lending banks) headed by J. P. Morgan & Company (which we shall call Morgan) made two loans, one of $16,000,000 to Vaness[1b] and one of $23,500,000 to the debtor's subsidiary. The defendant, because of the interest of its subsidiary, Guaranty Company, as one of the important sellers of the debtor's notes, participated in these loans to the extent of $11,000,000. The loan to Vaness was secured by the pledge of various securities, including all the stock of the debtor, i.e., 1,744,800 shares. The loan to the debtor's subsidiary was secured by listed stocks owned by it, having a market value of $38,000,000. Part of the proceeds of the loan to Vaness was used by it to purchase $10,000,000 face amount of government bonds which were substituted for the 500,000 Alleghany shares, the "assigned securities," in this way: Vaness delivered those bonds to the Van Sweringens who delivered them as "assigned securities" to the debtor in exchange for the Alleghany stock. The Van Sweringens, in turn, delivered to Vaness the non-negotiable obligation of the debtor for $10,000,000. That obligation was pledged by Vaness to the banks which made the loan to it. $5,000,000 of the loan to the debtor's subsidiary was used to purchase government bonds which, by arrangements between the debtor and the subsidiary (not necessary to describe here) were substituted for the 400,000 Alleghany shares theretofore constituting the "segregated assets." As a result of this and other transactions, the debtor, in addition to $15,000,000 of "segregated assets" and "assigned securities" and all the stock of the subsidiary, also became the owner

[1b] This loan was later increased to $18,000,000.

of an open account claim against the subsidiary in the amount of approximately $27,000,000. The November 1, 1930 interest on the notes was paid out of the proceeds of the loan to Vaness. The only debts of the debtor consisted of the $30,000,000 note issue, the subordinated obligation to the Van Sweringens, and a contingent liability for a maximum of $4,000,000, as guarantor of an $8,000,000 secured first mortgage bond issue of the subsidiary.[2] As the record stands, on appeal from a summary judgment, there is no reason to believe that the debtor would ever have been called upon to pay anything on this guaranty.

During the summer of 1931, the debtor's outstanding notes fell in market value. The debtor, using part of the "segregated assets," purchased on the market some of those notes at fifty cents on the dollar and some at thirty cents on the dollar. By October 29, 1931, the debtor had thus purchased, for $1,815,057.89, notes in the face amount of $3,773,000. Had that process of buying in notes at fifty or less continued, the debtor, on acquiring $15,000,000 of such notes, would have caused them to be cancelled; thereupon the remaining "assigned securities," having a cash value of at least $7,500,000, could, under the unusual provision of the Indenture, be withdrawn by Vaness upon surrender to the debtor of its non-negotiable obligations. In that event the debtor and its creditors would lose any claim to that $7,500,000, i.e., there would be $7,500,000 less of assets available to the noteholders. The noteholders could then look only to the other assets of the debtor, which consisted of the shares of the debtor's subsidiary (which appear by that time to have become valueless) and the $27,000,000 open account claim against the subsidiary on which, so the trustee then apparently believed, the debtor would probably never recover a sufficient amount to pay more than a relatively small portion of the face of its notes. At the same time, the $7,500,000 withdrawn by Vaness, under the terms of its arrangements with the lending banks, would be paid to those banks on account of their loans to Vaness.

The defendant, the trustee, was fully aware of this situation. It also knew that another crisis was at hand. For it knew that the debtor had no funds with which to pay the third installment, due November 1, 1931, of interest on its notes; that the debtor's subsidiary could not supply those funds; that Vaness had no money or assets available for that purpose except $300,000 of excess value of "assigned securities"; and that $300,000 was insufficient to pay all the interest, which amounted to approximately $728,000.[3]

The trustee canvassed the possibility of liquidation proceedings against the debtor, since such proceedings would stop the process of buying in notes and would prevent the withdrawal by Vaness of "assigned securities" after the reduction of the note issue to $15,000,000 which would result from such purchases if they continued. The affidavits, presented by defendant on its motion for summary judgment, of the officers of the defendant and of Guaranty Company, strongly indicate that the trustee then believed that it could, and that in fact it then could, compel the debtor's liquidation in November 1931, because of the inability of the debtor to pay the November 1 interest installment due on the notes. [3a] For, if default should then occur, the trustee would have the power, under the Indenture, to accelerate the maturity of the notes, thereupon to obtain a judgment for approximately $27,000,000, and then, armed with that judgment, to cause the debtor's liquidation.

Moreover, because of the sharp drop in market value of the listed stocks owned by the subsidiary, and because of the serious reduction in the value of the subsidiary's other assets (consisting principally of mortgaged real estate), the investments of the debtor in the subsidiary (which constituted the debtor's only assets other than

---

[2] Defendant, in its brief in this court in Hackner v. Morgan, infra, so interpreted the maximum obligation under that guaranty.

[3] The Indenture did not permit the use of "segregated assets" for that purpose.

Had more than the $300,000 "excess" of the "assigned securities" been so used (assuming without deciding, that the Indenture permitted such use), there would, to that extent, have been a defi-

ciency in such securities and the Van Sweringen brothers would have been obligated to repair that deficiency. The record more than suggests that they could not have done so.

[3a] On the present record, it would seem that the $500,000 loan, by Cleveland banks, made for that purpose could not have been obtained except as part of the offer-plan described below.

cash in the amount of about $13,444,000) had become so reduced in value that the debtor was probably insolvent, i.e., the amount of its liabilities probably exceeded the value of its assets. Under the Delaware statutes, a receiver of a Delaware corporation which is thus insolvent may be appointed in that state at the suit of an unsecured creditor having no judgment. It may, then, be true that the trustee could have procured the appointment of a receiver for the debtor.[3b] After such appointment, the trustee, under the Indenture, could have accelerated the maturity of the notes, quite apart from any default in payment of interest.[3c]

The trustee believed that liquidation proceedings, if then begun against the debtor, would almost surely precipitate insolvency proceedings against Vaness and the debtor's subsidiary. On the facts now before us, we cannot say that the trustee did not believe that such insolvency proceedings against the subsidiary would substantially reduce the recovery by the lending banks on their $23,500,000 loan to the subsidiary. That loan was secured only by the subsidiary's listed stocks which then had a market value of only approximately $8,200,000, leaving a deficiency of more than $15,000,000. The trustee may have hoped that the market value of those listed stocks would rise to some extent so as to reduce that deficiency, and believed that, if receivership or bankruptcy of the subsidiary were then averted, its real estate would increase in value sufficiently to enable it to pay some of that deficiency and also to pay something substantial on its open account claim of $27,000,000 held by the debtor.

On the facts as they now appear, if liquidation proceedings against the debtor had been instituted in 1931, all the noteholders would have received from the cash on hand at least from 42.2% to 49% of the face of their notes. For the debtor then would have had available for distribution among its creditors approximately $13,444,000 of cash (or its equivalent) consisting of "segregated assets" and "assigned securities."[4] The debtor's liabilities (ignoring the subordinated obligation to the Van Sweringens) consisted of outstanding notes, in the face amount of approximately $26,227,000, and the contingent obligation previously described. Assuming that no actual obligation would have accrued on the contingent liability, there would have been available on liquidation proceedings, before deducting expenses, sufficient to pay in cash more than 51% of the face of the notes. As the debt structure of the debtor was very simple, and as its assets other than cash and government bonds consisted solely of the stock of, and the open account claim against, its subsidiary, the expense of such a proceeding, we estimate, for present purposes, as not to exceed $590,000.[4a] On that basis, the debtor's liquidation would have yielded all the noteholders at least 49% in cash. Even if we assume that the debtor would have been obliged to meet the $4,000,000 contingent liability in full, we estimate that the liquidation would have yielded, after expenses, about 42.2% in cash for all noteholders.[5]

The trustee decided not to bring about the liquidation of the debtor. Instead, on or about October 29, 1931, the trustee, the debtor, Vaness, Morgan and the lending banks agreed upon a plan which we shall call the offer plan. Under this plan, all noteholders were paid the 3% interest on November 1, and were offered, in exchange for their notes, 50% of the face of the notes in cash and 20 shares of the debtor's stock for each $1,000 note.[5a] The offer was to remain open until December 1,

---

[3b] This fact may appropriately be canvassed at the trial.

[3c] At the trial, it may also be appropriate to consider whether the facts were such that the trustee could successfully have procured the debtor's adjudication in bankruptcy.

[4] This figure included the "excess" of about $300,000 of "assigned securities." As to the inability to withdraw such excess after liquidation began, see footnote 1a, supra.

[4a] In order to be conservative, we use a highly generous figure here.

[5] If, contrary to what we said in footnote 1a, the $300,000 excess were not included in the assets available on liquidation, then the above estimated percentages would be reduced to approximately 47.7% and 41.1%, respectively. On that basis, deducting the 3% interest, the non-accepting noteholders lost, under the offer plan, from 38.1% to 44.7%.

[5a] If all noteholders had accepted, they would have received in the aggregate 324,540 shares, leaving 1,419,260 or more than 80% in the hands of the lending banks as collateral. Thus the offer would not divest Vaness (or the banks as its pledgee) of voting control of the debtor.

1931.[5b] On October 29, $26,227,000 face amount of notes were outstanding. By the terms of the offer plan, the first $11,227,000 of notes thus acquired were to be cancelled, thereby reducing the note issue to $15,000,-000. Thereupon Vaness was to withdraw the remaining "assigned securities" consisting of about $7,500,000 of cash (or its equivalent) and those monies were to be used, so far as necessary, to acquire further notes from those who accepted the offer. Such notes, being purchased by Vaness, were not to be cancelled but were to remain outstanding, and to be delivered to the lending banks as additional collateral security for their loans. The $300,00 of excess "assigned securities" was to be applied towards payment of the November 1 interest on the notes; the balance of the money necessary for that interest payment (estimated as "approximately $500,000") was to be procured by a loan to the debtor by certain Cleveland banks. If, after the $11,227,-000 notes were cancelled, any noteholder did not accept the offer, so that, as a result, some part of the $7,500,000 was not used to purchase notes, it was to be applied by Vaness first in payment of that loan by the Cleveland banks and then on account of the $1,280,000 interest then due on the loan of the lending banks, no other funds for the payment of that interest being available. If there were not a sufficient balance of the $7,500,000 to pay the Cleveland banks in full, then they were to be paid out of the first amounts realized by the landing banks on the debtor's uncancelled notes which the lending banks were to receive as collateral security under the plan. The lending banks agreed to release from their collateral so much of the stock of the debtor as might be necessary to carry out the terms of offers accepted by noteholders.

Those noteholders who accepted the offer would thus receive in cash 53%, i.e., 50% principal and 3% interest. Those who did not accept would receive merely the 3% interest in cash. Thus the offer plan gave accepting noteholders from 4% to 10.8%[6] more in cash than they would have received in liquidation, i.e., 42.2% to 49%. But non-acceptors, receiving in cash only 3% interest, were, under the offer-plan, denied from 39.2% to 46% of the amount of cash they would have received on liquidation. As to the principal of their notes, they were left merely with a right to participate—as part of a class of holders of $15,000,000 of notes —in whatever the debtor might subsequently realize on the open account claim against the subsidiary. In the next year, the non-accepting noteholders received an additional 6% by way of interest. This payment reduced their loss so that, regarding solely their loss of participation in the cash assets, they lost from 33.2% to 40%.[6a]

If all the noteholders had accepted the offer, the only advantages to them over and above the results of liquidation, if then caused by the trustee, would have been the saving of the expense of such liquidation (and perhaps the sharing in the $300,000 excess). But the disadvantage of avoiding liquidation to those who did not accept the offer would, so the trustee appears to have believed, be far greater. For the facts now before us strongly suggest that the trustee, while anticipating that, after the consummation of the offer-plan, there would be some recovery for the non-accepting noteholders, did not believe that such recovery, together with the interest they received, would amount to anything remotely approaching what they would have received on liquidation in 1931.

The trustee sent to the noteholders no information or advice concerning the offer plan. The written offer sent by the debtor to the noteholders was completely silent as to the existence of the loans by the lending banks, the participation of the defendant in such loans, the provision of the plan that those banks might receive part of the $7,-500,000 and part of the uncancelled notes, the loan by the Cleveland banks and the arrangements for the payment of that loan, the fact that as an alternative to the offer plan the trustee could have caused liquidation of the debtor, or an estimate by the trustee of what such liquidation would have yielded.[7]

As matters worked out, the holders of all but $1,213,000 face amount of notes accepted the offer. As a consequence, there were left outstanding $15,000,000 of notes, of which $13,784,000 were, under the offer plan, delivered to the lending banks as ad-

---

5b It was later extended to December 15.

6 Doubtless, too, they received this cash far more promptly than they would have received distribution via liquidation.

6a Using the figures in note 5 supra, they lost from 32.1% to 38.7%.

7 Other omissions from the offer will be noted below.

ditional collateral security. Because holders of $1,213,000 of notes did not accept, there remained, out of the $7,500,000 withdrawn cash, the sum of $606,000,[8] i.e., the 50% which would have been paid to the non-accepting noteholders if they had accepted the offer. Of this amount, approximately $500,000 was, under the plan, payable and paid to the Cleveland banks. The lending banks, under the plan, were entitled to receive the balance of the $606,000—i.e., $106,000—to be applied on the interest on their loans. Morgan, on behalf of the lending banks, received that $106,000, but (for reasons not appearing in the record) allowed Vaness to expend it for other purposes.[9] Accordingly, the lending banks actually received $106,000 which apparently they could not possibly have received had the trustee instituted liquidation proceedings against the debtor in 1931.

But the offer plan might have yielded the banks far more than $106,000. For, of course, no one knew when the offer was made, how many noteholders would not accept. Had the holders of, say, $3,500,000, failed to accept, then, out of the $7,500,000, of cash, there would have been left $1,750,000 of which (after paying the Cleveland banks) the lending banks would have received not $106,000 but $1,250,000.

Nor can we say that the trustee did not then believe that, in addition to participation in some part of the $7,500,000, the banks would receive other substantial advantages from the offer plan.[9a] For, at the time when the offer was made, the lending banks, including the trustee, were apparently confident that, if liquidation proceedings against the debtor did not occur and thereby insolvency proceedings against the subsidiary were prevented, the debtor would subsequently realize (on its open account claim against the subsidiary) a substantial sum. That they anticipated that this realization would be at least $500,000 appears from the fact that the loan of the Cleveland bank could not be assured of payment unless that sum were thus realized since, if all the noteholders accepted the offer, the only source of payment of that loan would be such a realization of $500,000. The trustee knew that if a sufficient number of noteholders failed to accept, so that out of the $7,500,000 enough cash remained to pay off the Cleveland banks, then the lending banks would, as pledgees, become the holders of at least (approximately) $1,000,000 face amount of the $15,000,000 notes left outstanding and that any such anticipated realization of at least $500,000 would be paid, pro-rata, to the banks, as such holders of notes, and the non-accepting note-holders.[10] Since the banks, as matters turned out, became the pledgee-holders of about 92% of those $15,000,000 of notes, it follows that, if the anticipated minimum of $500,000 had been realized, those banks would have received 92% of any such realization, or $460,000, while the non-accepting noteholders would have received merely $40,000, i.e., less than 4% of the face of their notes.

In fact, because of the subsequent difficulties of the subsidiary, nothing was thereafter paid on any of the outstanding notes except a payment of 6% interest in 1932. The non-accepting noteholders thus never received for their investment anything other than interest up to, and including, November 1, 1932, (i.e., interest for two and one-half years) and nothing whatsoever on the principal of their notes.

In April 1940, three of the noteholders who accepted the offer began an action against the defendant and Morgan, charging fraud and misrepresentation. Miss York, the plaintiff in the suit now at bar, subsequently tried to intervene in that action as a party plaintiff, but her intervention was denied. Hackner v. Guaranty Trust Co., 2 Cir., 117 F.2d 95, certiorari denied 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520. For lack of claims in the requisite jurisdictional amount, the suit was also dismissed as to the original plaintiffs, but it was allowed to continue, under the name of Hackner v. Morgan, as to Miss Eastman,

---

[8] In fact the withdrawn "assigned securities" amounted in cash value to approximately $7,516,000, or an excess of some $16,000 which is unexplained and which we ignore in these calculations.

[9] Included in such expenditures was an item of approximately $53,000 paid to the Cleveland banks for monies borrowed for purposes other than paying the November 1 interest; the plan did not provide for payment of such a loan out of the $7,500,000.

[9a] We shall later discuss still other substantial advantages.

[10] The lending banks, holding the greater part of the debtor's stock to secure a loan on which the interest was unpaid, presumably could have voted that stock and thus, controlling the debtor, could have compelled such payment.

an intervening accepting noteholder. In that suit, on defendant's motion, the district court entered a summary judgment for the defendants (Eastman v. Morgan, 43 F. Supp. 637) and we affirmed; Hackner v. Morgan, 2 Cir., 130 F.2d 300, certiorari denied Eastman v. Guaranty Trust Co., 317 U.S. 691, 63 S.Ct. 266, 87 L.Ed. 553. In our opinion (based on the same affidavits, with one minor and unimportant exception, as those in the present record) we said that Miss Eastman had not shown that she suffered any loss, because had she not accepted, she would ultimately have received less than the 53% (that is 50% of the face of her notes plus 3% interest) which she obtained via the offer. We could have stopped there, but a majority of this court went on to say that, since there was no res, there was no trust, and that as, therefore, no breach of trust could exist, Eastman could not recover, even had a loss been proved.

Plaintiff, as the holder of notes of $6,000 in face amount, began the instant suit, making sufficient allegations of diversity of citizenship, several months after she had been dismissed as plaintiff in Hackner v. Guaranty Trust Co., supra. She sued on behalf of herself and other similarly situated noteholders who did not accept the offer, charging a breach by the defendant of its duties and obligations as a trustee and seeking an accounting. Both plaintiff and the defendant moved for summary judgment. On those motions, there were before the court the affidavits of George Whitney, one of the directors of the defendant, Arthur E. Burke, Vice President of the defendant, and Alfred Shriver, a Vice President of Guaranty Company.[11] The district court, relying on our statement in Hackner v. Morgan, held that, as here also there was no trust, no breach of trust could be found as a matter of "law," and therefore no basis for recovery existed, regardless of whether or not there was a loss. The district court accordingly entered summary judgment for the defendant.

2. In Brooklyn Trust Company v.

Kelby, 2 Cir., 134 F.2d 105, 116, decided after our decision in Hackner v. Morgan, we noted that, if the word "res" were translated as "thing," its vagueness might be more apparent, and that such a "thing" could be an intangible, as, for instance, a chose (thing) in action.[12] Subsequently, in Clarke v. Chase National Bank, 2 Cir., 137 F.2d 797, 801, we held that, under a trust indenture, there could be a fiduciary relation with resultant fiduciary obligations, despite the absence of a res. We now add that where, as here, an indenture confers upon a trustee the power to sue for noteholders and other powers, the trustee holds these powers in trust.[13]

We conclude, therefore, that the defendant here was a trustee with fiduciary obligations to the noteholders.

3. Accordingly, the principal issues here are these: Did the defendant, as trustee, fail to discharge its fiduciary obligations to the non-accepting noteholders? If so, then, as a result of such conduct, did they suffer a loss?

4. We have already seen that, on the basis of the facts now before us, the defendant, in November 1931, could probably have compelled the debtor's liquidation. As will appear from our discussion below, because of the exculpatory clauses of the indenture, the defendant, absent a showing of bad faith resulting from the presence of a substantial adverse interest, would not be liable for any loss to any noteholder resulting from its failure to cause that liquidation. It becomes, then, a major issue whether such a substantial adverse interest existed. The record facts sufficient suggest its existence to render erroneous the summary judgment for defendant, but do not sufficiently demonstrate its existence to justify our directing the entry of such a judgment for plaintiff. That a trial of those issues is necessary will appear from the following.

5. The defendant, in October 1930, although not legally obligated to do so, become one of the group of lending

---

[11] Defendant also filed an affidavit showing that the banks realized nothing on the uncancelled notes of the debtor which they received as collateral.

[12] We cited suits, quasi in rem, under 28 U.S.C.A. § 118, such as Omaha National Bank v. Federal Reserve Bank, 8 Cir., 26 F.2d 884; Rensselaer & S. R. Co. v. Irwin, D.C., 252 F. 921; Thomp-

son v. Terminal Shares, 8 Cir., 89 F.2d 652; Thompson v. Murphy, 8 Cir., 93 F.2d 38.

[13] As we observed in Clarke v. Chase National Bank, the presence of exculpatory clauses serves to emphasize the existence of a trust.

We discuss the exculpatory clauses below.

banks. As a consequence, if the process of purchasing notes, begun in 1931, continued, the defendant, as one of the lending banks was sure to receive a substantial financial benefit through the payment by Vaness of at least $7,500,000 on the precarious loan to it made by those banks. The defendant, therefore, occupied a dual position: If it failed to take steps, using its powers as trustee, to protect the noteholders by stopping that process of note-buying, the defendant would certainly reap a marked advantage. In such circumstances, as we shall see, the exculpatory clauses of the Indenture could not serve as a shield from liability to note-holders who sustained a loss because of its failure to take such steps. Nor would the trustee be protected because it came to occupy that dual position (through its participation in the October 1930 bank loan) in all good faith, for the best of motives, and with no expectation that sharp conflict would ever arise between the best interests of the noteholders and its own self-interest. Once that conflict occurred, defendant had the obligation either to disregard what might serve its self-interest or to resign as trustee.

■ The defendant did not resign but, instead of then bringing about the debtor's liquidation, acquiesced in an alternative— the offer plan. If (a) this plan involved no substantial actual or potential personal benefit to the trustee, or (b) if the facts were fully disclosed to the noteholders to whom the offer was made, so that any noteholder not accepting could fully have understood such actual or potential advantages to the trustee and the probable consequences of not accepting the offer, then the trustee is not liable for the loss to those who did not accept.

On the facts now before us, we cannot say that the offer plan did not involve substantial actual and anticipated potential selfish advantages to the trustee, and did not create such an adverse interest as, absent full disclosure of the facts to the noteholders, imposed liability on it for losses to non-acceptors. For, as we saw, the plan, when agreed upon, was not at all unlikely to confer benefits on the trustee, as one of the lending banks, which it could not obtain if, as trustee, it caused the debtor's liquidation. Thus, as above noted, it was then obvious that, should the holders of $3,500,000 of notes refuse the offer, the lending banks, under the plan, would receive $1,250,000 not available to them on the debtor's liquidation. In fact, they did receive $106,000 under the plan. Also the trustee knew that, under the plan, those banks would in all likelihood become holders of some of the uncancelled notes[14] and that, if they did, they would subsequently share in the then anticipated minimum realization of $500,000. Also, the trustee appears to have believed that the substitution of the offer plan for liquidation of the debtor would prevent receiverships or bankruptcy of Vaness and the debtor's subsidiary; if so, the plan would benefit the banks by preventing injurious effects on the loans by those banks to those companies.[14a]

■ The defendant, which denies that it derived, or stood to derive, any benefits from the plan, argues, in the alternative, that if it received any such actual or potential benefits, it gave ample consideration therefor, since, had the offer plan not arrested the process begun in 1931, of buying and cancelling notes, the lending banks, including the trustee, would have received from Vaness at least $7,500,000 of cash which Vaness would have withdrawn. But that argument lacks cogency because the defendant was not merely one of the lending banks. It was also a trustee which, as such, had the power, by forcing the debtor's liquidation, to prevent those banks from receiving any part of that $7,500,000 to the detriment of any of the noteholders.

If, contrary to what we indicated above,[14b] the $300,000 excess in the "assigned securities" could have been withdrawn by Vaness after the institution of liquidation proceedings against the debtor, then that sum would have gone to the banks on liquidation. On that assumption, the banks under the offer plan gave up a right to $300,000 and, therefore, the $106,000 was not a bene-

---

[14] In fact, as we saw, they became the holders of about 92% of the outstanding notes.

[14a] The plan would leave the lending banks with voting control of the debtor; see footnotes 5a and 10. It would also probably give, and in fact did give, those banks more than 75% of the outstanding notes, thus preventing the non-accepting noteholders from procuring the demand by 25% necessary to compel action by the trustee against the debtor of a kind which would precipitate insolvency proceedings against Vaness and the subsidiary.

[14b] See footnote 1a.

fit which they obtained by that plan. Even so, however, the plan, when agreed upon, was not unlikely to yield them other substantial advantages, above described, which could not have come to them on liquidation: They might well have obtained considerably more than $300,000 through the plan, and the plan prevented receiverships of Vaness and of the subsidiary, with advantages to the banks of the kind above described.

The trustee could have blocked the offer plan by insisting on the debtor's liquidation. If, then, the trustee had desired to avoid liquidation and, at the same time, to avoid, as far as possible, benefits to itself at the expense of those noteholders who would not accept the offer, it could, and would, have said to Vaness and the other lending banks that it would allow the plan to go through only if modified as follows: The first payment, out of (a) any balance of the $7,500,000 not needed to pay accepting noteholders and the Cleveland banks and (b) any subsequent realizations by the debtor, must be paid to non-accepting noteholders until they received at least 50% of the face of their notes,[14c] and only then should anything be paid from either of those items to the lending banks.[14d] Such a step would, on the facts before us, seem to be the least the trustee should have done to protect the non-assenting noteholders, although it may be doubted whether, on the

facts as they now appear, such a modification of the plan would have purged the plan of impropriety by the trustee since, even thus modified, the plan would have benefited the lending banks by preventing the subsidiary's receivership. But even that step the trustee did not take.

In sum, the facts now before us (which may appear to be decidedly different after a trial) more than suggest that the trustee may have believed that, under the offer plan, non-accepting noteholders would receive very substantially less than they would have received through liquidation (which the trustee could then have compelled) and that the trustee may have known that it probably stood personally to gain substantial advantages, as one of the lending banks, which it could not obtain if such liquidation then occurred.

Of course, the courts should not impose impractical obligations on a trustee. Merely vague or remote possible selfish advantages to a trustee are not sufficient to prove such an adverse interest as to bring his conduct into question. But here the advantages seem not to have been thus vague or remote.[15] That a trustee owes his beneficiaries undivided loyalty entirely untinged by considerations of any important benefits to himself is an old truth, and one whose edge cannot be dulled by frequent use.[15a] If the trustee here allowed its judgment to be affected by any such factors,

---

[14c] Or, at least as much as they would have received on liquidation, using some reasonable estimated figure.

[14d] If the lending banks were entitled to the $300,000 "excess," then it would have been proper to provide that they should receive that sum before any payments were made to non-accepting noteholders.

[15] Our comments in Irwin v. Simmons, 2 Cir., 140 F.2d 558, 560–562, are not in point here. For defendant here is a trustee repeatedly designated as such in the notes and the indenture. The indenture vests in the trustee all rights of action; it provides that such actions shall be brought "in its name as trustee" and that the trustee "in its name and as trustee of an express trust" shall be entitled to sue for collection of all amounts due the noteholders.

[15a] Chief Justice Stone has said that this principle embodies "the precept as old as Holy Writ, that 'a man cannot serve two masters' * * * No thinking man can believe that an economy built upon a business foundation can

long endure without loyalty to that principle." Stone, The Public Influence of the Bar, 48 Harv.L.Rev. 1, 8.

In Bayer v. Beran, —— Misc. ——, 49 N.Y.S.2d 2, Mr. Justice Shientag said: "The fiduciary has two paramount obligations: responsibility and loyalty. * * * They lie at the very foundation of our whole system of free private enterprise and are as fresh and significant today as when they were formulated decades ago. * * * While there is a high moral purpose implicit in this transcendent fiduciary principle of undivided loyalty, it has back of it a profound understanding of human nature and of its frailties. It actually accomplishes a practical, beneficent purpose. It tends to prevent a clouded conception of fidelity that blurs the vision. It preserves the free exercise of judgment uncontaminated by the dross of divided allegiance or self-interest. It prevents the operation of an influence that may be indirect but that is all the more potent for that reason."

it acted improperly. Cf. Pepper v. Litton, 308 U.S. 295, 311, 60 S.Ct. 238, 84 L.Ed. 281. If it failed to exercise the powers it held in trust because it entertained a belief that such inaction might be to its own substantial benefit (while failing to consider the consequent harm to any of its beneficiaries) then it breached its obligations, regardless of whether its belief, objectively viewed, was illusory. That is to say, the trustee should be held liable [15b] if the trial court reasonably infers from the evidence at the trial that the trustee, in making its decision, was moved to do so in any degree by the thought that it might incidentally secure a substantial advantage to itself. In such circumstances, nothing would turn on the fact that the trustee did not in fact derive benefits, if its inactivity caused loss to any of its beneficiaries. Nor is it relevant that the great majority of the beneficiaries fared better through such inaction. The trustee owed an equal duty to all its beneficiaries; cf. Restatement of Trusts, s. 183. Those who suffered have a right to demand that the trustee put them in the financial position which they would have occupied, had it acted for the equal benefit of all. If the trustee is liable here, the measure of its liability is the loss suffered by the non-accepting noteholders, not the benefits derived by the trustee.

6. Even if, however, the plaintiff on the trial, proves that the trustee stood to gain substantially from its inaction (or thought that it did) and that the non-accepting noteholders lost by that inaction, the trustee will have a good defense if it proves that a full disclosure of the pertinent facts was made to them before the offer expired on December 15, 1931. We are not to be taken as holding that in all circumstances a trustee with an adverse interest can exculpate himself by disclosure to his beneficiaries; we limit that ruling to the facts of this case as they now appear. On the record, as it now stands, we cannot say that the requisite disclosure was made.

We turn first to the terms of the offer. [15c] It stated the amount of notes outstanding and the amount of cash available. It disclosed that the Indenture permitted the Van Sweringen brothers to withdraw all "assigned securities" after $15,000,000 of

notes were retired; that the debtor believed that the offer would be "mutually beneficial" to accepting noteholders and to the debtor; that the November 1, 1931 interest would "be paid in the usual way on presentation" of coupons; and that, under the offer plan, notes purchased after the retirement of $15,000,000, would be acquired "not by the coroporation but by the Van Sweringen interests," and would "remain outstanding on a parity as obligations" of the debtor with notes held by non-accepting noteholders. The offer also stated that acceptors would receive not only 50% in cash (in addition to 3% interest) but would receive some of the shares of the debtor. Nothing whatever was said in the offer to indicate that these shares were virtually without value, although such appears to have then been the belief of the trustee.

If the shares of the debtor thus offered to the accepting noteholders, had any value whatever, then even after the acceptance of the offer by enough of the noteholders to permit the cancellation of $15,000,000 of notes and the withdrawal of all the remaining cash (i. e., $7,500,000), the remaining assets of the debtor must have been sufficient to pay all the non-accepting noteholders in full, for, otherwise, the stock would be worthless. Consequently, the offer of those shares to accepting noteholders might have led the ordinary wayfaring noteholder to believe that, if he did not accept the offer, the debtor's assets would be ample to pay him one hundred cents on the dollar. Thus the offer, on its face, did not in any way disclose the difficulties which the trustee then thought were in store for a non-accepting noteholder.

The defendant, however, argues that the noteholders were put on notice that the debtor's shares at that time lacked value, because the offer advised them that balance-sheets of the debtor and its subsidiary would "be furnished on request." We assume, arguendo, that this statement served to give all the noteholders all the information they would have gleaned had they called for and read those balance-sheets. Any noteholder who did so, would have seen that the debtor apparently had $69,000,000 of assets to cover both the $26,246,000 of notes (plus interest thereon) and the contingent liability of not to exceed $4,000,000, or far

---

[15b] Subject to the qualifications noted later in this opinion.

[15c] The offer, signed by the debtor, was sent by the debtor or by investment bank-

ers to the noteholders. There is nothing, we repeat, in the record to show that the trustee gave the noteholders any data or advice concerning the offer.

more than enough assets, aside from the cash on hand, to meet all its debts (disregarding the subordinated obligations to the Van Sweringens). Put on notice of those facts, the noteholder would still have assumed that, if he refused the offer and if all the cash then on hand were paid out, he would be no worse off than if he accepted the offer.

The defendant correctly asserts that a close study of the balance-sheets would have revealed the worthlessness of the debtor's shares.[15d] But we cannot agree with defendant that such a study would also have shown that one who did not accept the offer would not be nearly as well off as one who did. The debtor's balance-sheets showed that among its assets were the shares of its subsidiary carried on the debtor's balance-sheet at cost, or approximately $29,000,000. Alongside this figure, a notation advised that it was based on book-values of the subsidiary's real estate and of the cost of securities owned by the subsidiary, without giving effect to "adjustment in market values of listed securities owned by subsidiary," in this connection calling attention to the balance-sheet of the subsidiary.

Turning now to the subsidiary's balance-sheet, it showed that, among its assets, were "listed stocks" carried at cost, or approximately $37,200,000. A footnote showed that these stocks, pledged to secure a $23,-500,000 note, had on September 30, 1929, been worth approximately $93,000,000; on September 30, 1930, approximately $38,-000; and, that on September 30, 1931 (the date of the balance-sheet) they had a market value of only (approximately) $8,200,-000. Here was a disclosure that these securities, at then market values, were worth approximately $29,000,000 less than their cost. The subsidiary's total assets were shown as approximately $103,000,000, so that, deducting the $29,000,000 shrinkage in the listed stocks, the subsidiary's assets appeared to be about $74,000,000. Against

this asset figure, were shown liabilities aggregating approximately $76,000,000. A noteholder who sent for, and carefully read, the balance-sheets would, then, have seen that, on the basis of the then low market values of the listed stocks owned by the subsidiary, the debtor's shares were worthless and that the investment of the debtor in the shares of the subsidiary—approximately $29,000,000—had no value.

On the other hand, although the subsidiary's debts were shown to exceed its assets, yet, according to the balance-sheet the proportion of assets to debts was such that the debtor's $27,000,000 open account claim against the subsidiary appeared to be worth at least $15,000,000.[16] On that basis, after the offer plan was consummated, the debtor would have sufficient assets to pay the full face of its then outstanding $15,000,000 of notes; even if the debtor were liable in full, on its $4,000,000 contingent liability, so that its liabilities would be $19,000,000, it would have enough assets to pay more than 78% on the face of those notes. A noteholder might, therefore, reasonably have thought that he would be no worse off if he did not accept the offer.

Nothing in the offer intimated in any way that serious shrinkage in the value of the subsidiary's real estate assets of which the trustee, according to the affidavits filed by it, then had a lively awareness. No adequate warning of this fact was given by the notations, in the subsidiary's balance-sheets, that its land and building were carried at cost or on the basis of appraisals. True, attached to the balance-sheet was an income statement, for the first nine months of 1931, which showed a net loss for that period (after deducting depreciation) of approximately $1,633,000. This loss (resulting from an excess of operating expenses, taxes and fixed charges over rentals received) would serve to indicate that there was a lack of net earnings on the improved real estate of the subsidiary for the preceding nine months. But that fact would

---

[15d] In making that contention, defendant is driven to admit that the offer was misleading since it included an offer of shares hopelessly without value, unaccompanied by a clear explanation of that fact. The defendant, on the facts before us, did nothing to aid the noteholders to discover that fact.

[16] If the figure of $37,200,000, representing the listed stocks, were deducted from the assets, but the entire $23,500,-000 note secured by those stocks were

still included in the liabilities, there would be assets of about $65,000,000 to cover about $76,000,000 of liabilities (including the liability on the $27,000,000 open account owing to the debtor). Those figures indicated that the open account claim was worth about $23,000,-000. We shall not here attempt a nicer analysis but, in order to be conservative, we assume that the open account claim appeared, from the balance-sheet, to be worth at least $15,000,000.

not alone seem sufficient to suggest that so much of the subsidiary's assets as consisted of real estate had so seriously shrunk in value as to reduce the value of the $27,000,000 open account claim owing to the debtor to less than, say, $11,000,000, i. e., a sum more than sufficient to yield 53% of the notes which would be outstanding if the offer transaction were carried out (even assuming that the debtor would be held fully liable on the $4,000,000 contingent liability).

Accordingly, on the facts now before us, there was no adequate disclosure to a noteholder that, in the trustee's opinion, if he did not accept the offer and other noteholders did accept in a sufficient amount to reduce the note issue to $15,000,000, in all probability he would recover very substantially less than if he accepted. Nor was he told that liquidation of the debtor presented an alternative to the offer plan [17] but that such liquidation in the opinion of the trustee, would be somewhat less advantageous to him than acceptance of the offer but far more advantageous than its rejection. Nor was there a syllable to suggest that the trustee was one of a group of banks which had loaned large sums to the debtor's parent, Vaness, and to the debtor's subsidiary; that, under the offer plan, those lending banks, including the trustee, might reap substantial advantages which they would never obtain if the debtor were liquidated through proceedings then begun; and that, inter alia, those notes purchased under the offer plan which were not to be cancelled would be received by those banks as collateral.

■■■ We think that in the circumstances (assuming that the trustee had a substantial adverse interest), it could have avoided liability for loss to the non-accepting noteholders only by a disclosure, in clear terms, of the nature of that interest, of the alternative of liquidation together with a statement of what the trustee regarded its probable consequences, and of facts showing why, in the trustee's opinion, the acceptance of the offer promised to be more beneficial to noteholders than its rejection.

On the present record, nothing like such a disclosure was made. If, then, the plaintiff, at the trial, proves that the defendant was in any degree actuated by a substantial adverse interest and the defendant fails to adduce evidence of a more adequate disclosure than that contained in the offer, balance-sheets and income statement, plaintiff must win.

■■■ Had the trustee in 1931 caused the debtor's liquidation, the liquidation of the subsidiary (so defendant's affidavits more than suggest) would soon have followed. There might have resulted a substantial recovery on the open account claim against the subsidiary. While it is arguable that that recovery, on the facts before us, would, perhaps not have yielded the noteholders an amount which, together with their participation in the cash assets then in the debtor's hands, would have equalled the 53% offered under the plan, it might well have given them in excess of 50%, although apparently the trustee did not think so. What that recovery might have been, no one now can estimate with any high degree of accuracy. But, if defendant wrongfully failed to bring about that liquidation, it cannot avail itself of the resulting difficulty of making that estimation. "The wrongdoer is not entitled to complain that" the damages "cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise," for "the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party. * * *" Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 563, 564, 565, 51 S.Ct. 248, 250, 251, 75 L.Ed. 544.[18]

■■■■ 7. Defendant in its petition for rehearing for the first time asserted that, on the face of the complaint, it appears that the court lacks jurisdiction because plaintiff's claim, exclusive of interest and costs, does not exceed $3,000. That contention requires defendant to show that it is a "legal certainty" that the plaintiff's claim is below the required figure. See St.

---

[17] As a matter of fact that alternative had disappeared on November 14, 1931, about two weeks after the offer was made, for by that date, as enough notes had been bought and cancelled, the note issue was reduced to $15,000,000 and, accordingly, Vaness then withdrew the $7,500,000.

[18] See also, Great Southern Gas & Oil

Co. v. Logan Natural Gas & Fuel Co., 6 Cir., 155 F. 114, 115, certiorari denied 207 U.S. 590, 28 S.Ct. 256, 52 L.Ed. 354; Lincoln v. Orthwein, 5 Cir., 120 F. 880, 886; Package Closure Corp. v. Sealright Corp., 2 Cir., 141 F.2d 972; cf. F. W. Woolworth Co. v. N. L. R. B., 2 Cir., 121 F.2d 658, 663.

Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288–290, 58 S.Ct. 586, 82 L.Ed. 845, and cases there cited. The absence of such a "legal certainty" is indicated by the fact that, until it filed its rehearing petition, defendant did not even suggest that defense.

It is true that, if defendant's loss related solely to the loss of participation in the cash assets which would have been available for distribution had liquidation occurred in 1931, her claim would probably not be in excess of $3,000.[19] But, as we have said, she suffered an additional loss of participation in what might have been recovered on the open account claim against the debtor's subsidiary, if liquidation had then occurred. That loss is of such a character that, when added to the loss of participation in the cash, it cannot be said that it is a legal certainty that plaintiff's claim is for less than $3,000.

■ Defendant urges that, if we conclude here that plaintiff's claim is for more than $3,000, our conclusion will be inconsistent with what we said as to the amount of recovery in Hackner v. Guaranty Trust Co., 2 Cir., 117 F.2d 95, and Hackner v. Morgan, 2 Cir., 130 F.2d 300. For reasons which we need not here set forth, we think there is no such inconsistency. But, assuming arguendo that there is, yet we are not bound here to abide by our previous conclusion, when, upon a searching examination of the facts, it appears to us to be incorrect; even if the statements in our earlier opinions were the "law of the case,"

we would not be obliged to stand by them when convinced of their error.[20]

■ 8. It has been suggested, however, that our decision as to plaintiff's attempted intervention in Hackner v. Guaranty Trust Co., 2 Cir., 117 F.2d 95, is an adjudication that the amount in controversy is not in excess of $3,000 and that therefore the court below, the very court in which Hackner v. Guaranty Trust Company was brought, lacked jurisdiction here. In Hackner v. Guaranty Trust Co., the action was begun by noteholders who had accepted the offer and who sought recovery against Guaranty Trust in deceit because of alleged false representations which induced them thus to accept. None of the noteholders who instituted that action had a claim in the jurisdictional amount. Plaintiff endeavored to intervene. On motions by defendants to dismiss the complaint and deny the intervention, the district court, on the pleadings, entered judgment for the defendants and we affirmed. Miss York's attempted intervention in that suit, based upon deceit, should be regarded, and was indeed by us there regarded, as, in effect, an action by her for recovery on the ground of deceit inducing her acceptance of an offer which in fact, according to her petition of intervention, she had not accepted. We there decided that, although she held notes in the amount of $6,000, her claim, on the facts alleged, was for not more than $3,000 and, on that ground, we held that she had been properly denied intervention. That decision on the plead-

---

[19] However, it might be said that, in computing the amount of plaintiff's claim, interest may be included. Interest on her notes is represented by matured coupons, and such interest could be added for jurisdictional purposes in an action against the debtor. Edwards v. Bates County, 163 U.S. 269, 16 S.Ct. 967, 41 L.Ed. 155. Perhaps that decision should be disregarded here, since it might be urged that plaintiff is not suing on her notes and coupons as such but is proceeding against the trustee for a loss which plaintiff suffered, measured by the amount which she could have recovered from the debtor but for defendant's wrongdoing. Even so, there could well be considered the doctrine of Brown v. Webster, 156 U.S. 328, 15 S.Ct. 377, 39 L.Ed. 440, i. e., that in an action for a tort there is to be included, in computing the jurisdictional amount, interest which forms part of the damages and

which therefore becomes "an essential ingredient in the * * * principal claim. * * *" See also Springstead v. Crawfordsville State Bank, 231 U.S. 541, 542, 34 S.Ct. 195, 58 L.Ed. 354; Chesbrough v. Northern Trust Co., 252 U.S. 83, 40 S.Ct. 237, 64 L.Ed. 470; Chesbrough v. Woodworth, 6 Cir., 251 F. 881, 883; Central Commercial Co. v. Jones-Dusenbury Co., 7 Cir., 251 F. 13, 17; Intermela v. Perkins, 9 Cir., 205 F. 603, 606; Nathan v. Rock Springs Distilling Co., 6 Cir., 10 F.2d 268; Simecek v. United States National Bank of Omaha, 8 Cir., 91 F.2d 214, 217, 218.

[20] See Messenger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152; Riehle v. Margolies, 279 U.S. 218, 220 et seq., 49 S.Ct. 310, 73 L.Ed. 669; Johnson v. Cadillac Motor Car Co., 2 Cir., 261 F. 878, 8 A.L.R. 1023; Hammond-Knowlton v. United States, 2 Cir., 121 F.2d 192, 205.

ings in such an action was not an adjudication that, in a suit based on a different theory—i. e., the defendant's breach of its fiduciary obligations in not causing the debtor's liquidation—her claim was not for the requisite amount.[21]

9. Defendant also relies on the exculpatory clauses of the indenture.[22] The provision that the "trustee may advise with counsel * * * and shall be fully protected in respect of any action taken or suffered * * * in good faith in accordance with the opinion of such counsel," has no application here, for no facts are shown indicating that, in failing to cause liquidation and in participating in the offer plan without full notice to all noteholders, the defendant acted on advice of counsel. The provisions that the trustee might purchase or own or hold any of the notes and "assert its rights in respect thereof in the same manner as any other noteholder," and engage in any financial transaction with the debtor or any corporation in which the debtor may be interested, did no more here than permit defendant to become a noteholder and a creditor of the debtor's subsidiary. It did not authorize defendant, when in that position, to subordinate the interests of any of the noteholders to its own.

Defendant stresses the provision that the trustee shall not be "answerable * * * for anything whatever in connection with this trust except for its own wilful misconduct," and cites New York decisions said to be pertinent here. We cannot agree. The case on which defendant chiefly relies is Hazzard v. Chase National Bank, 159 Misc. 57, 287 N.Y.S. 541, 547,

---

[21] Cf. discussion of res judicata in Southern Pacific Co. v. Bogert, 250 U.S. 483, 490, 491, 39 S.Ct. 533, 63 L.Ed. 1099.

This too should be noted: As appears from Ripperger v. A. C. Allyn & Co., 2 Cir., 113 F.2d 332, and Smith v. McNeal, 109 U.S. 426, 3 S.Ct. 319, 27 L.Ed. 986, a prior decision dismissing a suit on the mere pleadings for lack of jurisdiction is not a bar to a second suit alleging sufficient jurisdictional facts which existed when the first suit was pending but which were not therein alleged. Cf. Wiggins Ferry Co. v. Ohio & M. R. Co., 142 U.S. 396, 410, 2 S.Ct. 188, 35 L.Ed. 1055; Sylvan Beach v. Koch, 8 Cir., 140 F.2d 852, 860; Dennison Mfg. Co. v. Scharf Tag, Label & Box Co., 6 Cir., 121 F. 313, 318. It is by no means clear that the facts alleged in Hackner v. Guaranty Trust Co. bearing on plaintiff's participation in the recovery from debtor's subsidiary are substantially similar to those which appear in the present record if we include defendant's affidavits. If necessary, plaintiff could amend, either here or in the district court, when the case is remanded, to include in her complaint that portion of the facts contained in defendant's affidavits bearing on her participation in such recovery. 28 U.S.C.A. § 777; Federal Rules of Civil Procedure, rule 15(c), 28 U.S.C.A. following section 723c; Smith v. McCullough, 270 U.S. 456, 460, 46 S.Ct. 338, 70 L.Ed. 682; Realty Holding Co. v. Donaldson, 268 U.S. 398, 400, 45 S.Ct. 521, 69 L.Ed. 1014; Norton v. Larney, 266 U.S. 511, 516, 45 S.Ct. 145, 69 L.Ed. 413; Mexican Cent. R. Co. v. Duthie, 189 U.S. 76, 23 S.Ct. 610, 47 L.

Ed. 715; Kinney v. Columbia Savings & Loan Ass'n, 191 U.S. 78, 83, 24 S.Ct. 30, 48 L.Ed. 103; Thompson v. Automatic Fire Protection Co., C.C., 151 F. 945; Whalen v. Gordon, 8 Cir., 95 F. 305, 307; In re Plymouth Cordage Co., 8 Cir., 135 F. 1000, 1003; Gregg v. Gier, Fed.Cas.No.5,799; Missouri, Kansas & Texas R. Co. v. Wulf, 226 U.S. 570, 576, 33 S.Ct. 135, 57 L.Ed. 355; Atwood v. National Bank of Lima, 6 Cir., 115 F.2d 861, 863; New York Cent. & H. R. R. Co. v. Kinney, 260 U.S. 340, 346, 43 S.Ct. 122, 67 L.Ed. 294; Maty v. Grasselli Chemical Co., 303 U.S. 197, 200, 201, 58 S.Ct. 507, 82 L.Ed. 745; United States v. Memphis Cotton Oil Co., 288 U.S. 62, 68, 69, 53 S.Ct. 278, 77 L.Ed. 619.

But, for the reasons stated in the text, while it is perhaps desirable that plaintiff should thus amend when the case is remanded, such an amendment is not necessary to avoid defendant's res judicata argument.

[22] Each note expressly refers, six times, to the defendant as "trustee." There is not a syllable in the notes suggesting that the trustee is to be immunized from the usual obligations of a trustee, but the notes state that they are issued "under and pursuant to an Indenture * * * to which * * * reference is hereby made for a description of the terms on which such notes are issued and of the rights of the Trustee and of the holders of the notes under said Indenture. * * *" While the average noteholder, we know, as a matter of common knowledge, never reads such an indenture, yet all the noteholders are bound by its terms so far as they are valid.

(affirmed 257 App.Div. 950, 14 N.Y.S.2d 147; Id., 282 N.Y. 652, 26 N.E.2d 801), where the trust indenture provided that the trustee should not be answerable "under any circumstances whatsoever, except for its own gross negligence or bad faith." The trustee had made large unsecured loans to the obligor, its officers, and affiliated companies. The indenture permitted the obligor to withdraw securities pledged with the trustee and to substitute others provided the earnings, applicable to pay the interest under the indenture from all the securities remaining on deposit with the trustee after the substitution, for a certain period preceding the application for substitution, was at least twice the interest requirements for a period of one year. The plaintiff contended that the defendant was guilty of bad faith in permitting certain substitutions; it argued that the purpose of the trustee in permitting them was to enable the obligor to use the withdrawn collateral for the purpose of meeting the interest requirements on the debentures secured by the indenture, thus preventing the otherwise inevitable default in the payment of this interest in order to keep the obligor alive for six months during which time the trustee would be able to collect or protect its loans to the obligor and affiliated companies and to the officers of the obligor. The Court found as a fact that the plaintiffs had "not sustained the burden of proving that the trustee sought to obtain profit for itself at the expense of its debenture holders by its action in allowing the substitution, or that it was actuated in any way by bad faith." It found that the purpose of the withdrawal, so far as the trustee was concerned, was the furtherance of an expansion policy of the obligor and its affiliated companies and that there was "nothing to show" that the trustee "had any knowledge of any insincerity in these alleged * * * policies." On the facts, the Court also found that the trustee was not guilty of gross negligence. In the instant case, the issue is not that of defendant's negligence but whether defendant was guilty of "wilful misconduct" which we take to be the equivalent of "bad faith." The Hazzard case, where the findings of fact on that issue turned on the particular record evidence, has no precedential force here.[23] For here, on the facts now before us (which, we repeat, must be canvassed after a trial), it may appear that the defendant knowingly failed to take action and by so doing injured plaintiff, although defendant knew that such inaction and the concomitant plan would probably operate to the defendant's own substantial advantage.

■■ 10. The parties stipulated that plaintiff's notes "were originally acquired by the firm of Warren W. York & Company" and that "on April 19, 1934, the plaintiff received said notes as a gift and she has been the owner and holder thereof since that date." Defendant made nothing

---

[23] In Benton v. Safe Deposit Co., 255 N.Y. 260, 174 N.E. 648, 649, a suit against a trustee under a mortgage executed in Pennsylvania which provided that the trustee should not be liable "save for its gross negligence or wilful default," and that it "shall be no part of the duty of the Trustee to record this instrument," the mortgage not having been recorded and the notes not having been paid, a noteholder sued the trustee for the resulting loss. The Court, finding that under Pennsylvania decisions a trustee in such circumstances would not be liable, held for the defendant, saying that there was no such fundamental injustice in the exculpatory clauses as to forbid enforcement of them in New York as against the State's public policy. The Court, after quoting from a Pennsylvania decision (Bell v. Title Trust & Guarantee Co. of Johnstown, 292 Pa. 228, 140 A. 900, 57 A.L.R. 463) that such a noteholder could easily have learned of the non-recording, said, "The plaintiff could have ascertained all the facts upon inquiry; nothing was hidden or concealed." In Savings Bank of New London v. New York Trust Co., Sup., 27 N.Y.S.2d 963, 970, the indenture provided that the trustee should not be "answerable or accountable under any circumstances * * * except for bad faith." The trustee released part of the mortgaged property without receiving in return the money received by the mortgagor for such property. The Court held that the trustee was grossly negligent but that, on the facts before it, there was no showing of bad faith. In Ansbacher v. New York Trust Co., 280 N.Y. 79, 19 N.E.2d 790, the court held that, on the particular facts stated in the pleadings, the trustee was not guilty of gross negligence or bad faith; those facts are wholly unlike those before us. On its facts, Green v. Title Guarantee & Trust Co., 223 App.Div. 12, 227 N.Y.S. 252, is not in point.

of these facts in the court below nor here until it filed its petition for rehearing. Then it urged that, under New York decisions,[24] only the person who owned the notes at the time when the breach of trust occurred can maintain an action because of such breach since the action does not involve any charge of releasing any trust assets on which the notes were a lien. The New York cases seem so to hold. But they recognize that the cause of action may be specifically assigned.[25] If plaintiff here obtained her notes upon the dissolution of the firm, such an assignment to her may have been implied in fact. At any rate, on a motion for summary judgment, we cannot hold that she did not acquire the notes by an actual assignment, express or implied in fact. When the case is remanded, plaintiff may amend to set forth the actual facts concerning the assignment, and of course defendant will be at liberty to try to show that there was no express assignment or none implied in fact.[26]

11. Plaintiff alleges in her complaint that she did not learn of the trustee's participation in the 1931 offer plan until "the middle of 1940" when she sought to intervene in the Hackner v. Guaranty Trust Co. action. As previously noted, an order denying her intervention in that action was affirmed by this court. 117 F.2d 95. That action terminated as to her on April 7, 1941, when certiorari was denied in 313 U. S. 559, 61 S.Ct. 835, 85 L.Ed. 1520.

Defendant argues that, because of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, we must apply the New York statute of limitations as construed by the New York courts; that this action, if brought in a New York court, could have been brought at law; that it is therefore barred by the New York six-year statute, Civil Practice Act, § 48 subdivision 3 (as it stood prior to September 1, 1936) relating to such suits; that, if it be considered as being exclusively within the equity jurisdiction, it is nevertheless barred by the ten-year provision of § 53 of that Act which the New York courts have held applicable to equity suits of that kind; that the New York courts have decided that, under § 53, the statute is not tolled even if, because of defendant's misconduct, plaintiff was in ignorance of her rights until after the lapse of the ten years; that the only provis[i]on of the New York statute which makes allowance for such ignorance is subdivision 5 of § 48 which relates solely to "an action to procure a judgment on the ground of fraud," and that the New York courts have interpreted that section to apply exclusively to actions for deceit and the like. In short, defendant contends that, under New York law, and therefore in a federal court sitting in New York, a suit by a beneficiary against a trustee for breach of trust, unless it is the equivalent of an action for deceit, is barred at least after ten years, regardless of the fact that, due to the trustee's inequitable conduct, the beneficiary was ignorant of the cause of action until after the fixed statutory period. Assuming, arguendo, that defendant's interpretation of the New York decisions is correct, we reject defendant's contention for the following reasons.

Beginning in 1818 with Robinson v. Campbell, 3 Wheat. 212, 222, 4 L.Ed. 372,[27] the Supreme Court has repeatedly held that, while as to substantive rights, a

---

[24] Elkind v. Chase National Bank, 259 App.Div. 661, 20 N.Y.S.2d 213, affirmed 284 N.Y. 726, 31 N.E.2d 198; Emmerich v. Central Hanover Bank & Trust Co., 291 N.Y. 570, 50 N.E.2d 659; Hendry v. Title Guaranty & Trust Co., 255 App. Div. 497, 8 N.Y.S.2d 164, affirmed 280 N. Y. 740, 21 N.E.2d 515; Doyle v. Chatham & Phenix National Bank, 253 N.Y. 369, 171 N.E. 574, 71 A.L.R. 1405; Smith v. Continental Bank & Trust Co., 292 N.Y. 275, 54 N.E.2d 823.

[25] Smith v. Continental Bank & Trust Co., supra.

[26] This disposition of defendant's contention renders it unnecessary to consider the following suggestion: Restrictions on the bringing of stockholders' actions, such as those imposed by Federal Rules of Civil Procedure, rule 23(b) or state statutes, are procedural (cf. Piccard v. Sperry Corp., 2 Cir., 120 F.2d 328, affirming D.C., 36 F.Supp. 1006; Galdi v. Jones, 2 Cir., 141 F.2d 984; Tower Hill-Connellsville Coke Co. v. Piedmont Coal Co., 4 Cir., 64 F.2d 817, 828, 91 A.L.R. 648, certiorari denied 290 U.S. 675, 54 S.Ct. 93, 78 L.Ed. 582), and the restriction imposed by the New York courts on suits by assignees of notes is similar.

[27] In Robinson v. Campbell, supra, the Court, explaining this doctrine, said: "In some states in the Union, no court of chancery exists, to administer equitable relief. In some of those states, courts of law recognise and enforce, in suits at law, all the equitable claims and

federal court sitting in equity, in a suit where jurisdiction rests on diversity of citizenship, must apply state statutes and, usually, state decisions, yet it need not do so with respect to equitable "remedial rights." [28] As to substantive rights, beginning in 1842—twenty-four years after Robinson v. Campbell—with Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, the Court held, until recently, that the federal courts, in diversity cases, must follow state decisions except where there is no pertinent state statute and where a question of "general law" is involved. Swift v. Tyson was a suit at law, and its ruling was founded upon an interpretation of the so-called Rules of Decision Act, being § 34 of the Judiciary Act of 1789, now 28 U.S.C.A. § 725. That section, by its terms, applies only to suits at common law; but it has been held to be merely declaratory of the rule which would obtain even in the absence of such a federal statute and which therefore governs in equity as well as at law.[29]

Erie R. Co. v. Tompkins came to destroy the exception created by Swift v. Tyson, and did so both in law and equity suits.[30] But it did not purport to, and it did not, in any way alter the wholly distinct doctrine relating to equitable "remedial rights,"[31] which rests on § 11 of the Judiciary Act, now 28 U.S.C.A. § 41(1), conferring equity powers on the federal courts.[32] There can be no doubt that today, as before Erie R. Co. v. Tompkins, a federal court sitting in a given state will, for instance, refuse to appoint a receiver at the suit of an unsecured creditor although the statute of that state authorizes such an action,[33] or will grant equitable relief to a lessee under

rights which a court of equity would recognise and enforce; in others, all relief is denied, and such equitable claims and rights are to be considered as mere nullities, at law. A construction, therefore, that would adopt the state practice, in all its extent, would at once extinguish, in such states, the exercise of equitable jurisdiction."

[28] The progeny of Robinson v. Campbell are legion. See, e. g., United States v. Howland, 4 Wheat, 108, 115, 4 L.Ed. 526; Boyle v. Zacharie, 6 Pet. 648, 658, 8 L.Ed. 532; Livingston v. Story, 9 Pet. 632, 635, 9 L.Ed. 255; Neves v. Scott, 13 How. 268, 272, 14 L.Ed. 140; Payne v. Hook, 7 Wall. 425, 430, 19 L.Ed. 260; Kirby v. Lake Shore & M. S. R. Co., 120 U.S. 130, 7 S.Ct. 430, 30 L.Ed. 569; In re Sawyer, 124 U.S. 200, 209, 210, 8 S.Ct. 482, 31 L.Ed. 402; Mississippi Mills v. Cohn, 150 U.S. 202, 204, 14 S. Ct. 75, 37 L.Ed. 1052; Guffey v. Smith, 237 U.S. 101, 114, 35 S.Ct. 526, 59 L. Ed. 856; Pusey & Jones Co. v. Hannsen, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763; Henrietta Mills v. Rutherford County, 281 U.S. 121, 127, 50 S.Ct. 270, 74 L.Ed. 737; Atlas Ins. Life Co. v. W. I. Southern, Inc., 306 U.S. 563, 568, 59 S.Ct. 657, 83 L.Ed. 987; Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 164, 59 S.Ct. 777, 83 L.Ed. 1184; cf. Mason v. United States, 260 U.S. 545, 557, 558, 43 S.Ct. 200, 67 L.Ed. 396.

[29] Mason v. United States, 260 U.S. 545, 559, 43 S.Ct. 200, 67 L.Ed. 396, and cases there cited.

[30] Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290.

[31] See, e. g., Kelleam v. Maryland Casualty Co., 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899; cf. Sprague v. Ticonic Nat.

Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L. Ed. 1184; Atlas Life Ins. Co. v. Southern, Inc., 306 U.S. 563, 59 S.Ct. 657, 83 L.Ed. 987.

[32] In Atlas Life Ins. Co. v. W. I. Southern, Inc., 306 U.S. 563, 568, 59 S. Ct. 657, 659, 83 L.Ed. 987, the court, referring to this section, said: "This provision is perpetuated in § 24(1) of the Judicial Code, 28 U.S.C. § 41(1), 28 U.S.C.A. § 41(1), which declares that the district courts shall have jurisdiction of such suits. The 'jurisdiction' thus conferred on the federal courts to entertain suits in equity is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries. Payne v. Hook, 7 Wall. 425, 430, 19 L.Ed. 260; In re Sawyer, 124 U. S. 200, 209, 210, 8 S.Ct. 482, 486, 487, 31 L.Ed. 402; Matthews v. Rodgers, 284 U.S. 521, 525, 52 S.Ct. 217, 219, 76 L. Ed. 447; Gordon v. Washington, 295 U. S. 30, 36, 55 S.Ct. 584, 587, 79 L.Ed. 1282. This clause of the statute does not define the jurisdiction of the district courts as federal courts, in the sense of their power or authority to hear and decide, but prescribes the body of doctrine which is to guide their decisions and enable them to determine whether in any given instance a suit of which a district court has jurisdiction as a federal court is an appropriate one for the exercise of the extraordinary powers of a court of equity."

[33] Pusey & Jones Co. v. Hanssen, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763; Kelleam v. Maryland Casualty Co., 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899.

an oil and gas lease containing a clause giving the lessee an option of surrender although the state court refuses such relief.[34]

The point of this discussion is that it has often been held that, for the purposes of this doctrine, state statutes of limitations are to be regarded in the federal courts as affecting not substantive rights but merely equitable "remedial rights." [35] The Supreme Court so held in the leading case of Kirby v. Lake Shore & M. S. R. Co., 120 U.S 130, 7 S.Ct. 430, 433, 30 L. Ed. 569, an equity suit brought in the federal district court in New York, and based on the concurrent equity "jurisdiction." The lower court had held that it was bound by the New York statute, that the suit was not one within the statutory provision relating to an action "to procure a judgment * * * on the ground of fraud," as that provision had been construed by the New York courts, and that consequently the cause of action accrued upon the commission of the alleged frauds and not at the date of their discovery, with the result that the action was barred by the statute after the lapse of six years. The Supreme Court rejected that argument based upon the statute. After citing cases, including Robinson v. Campbell, supra, the Court said (120 U.S. at page 138, 7 S.Ct. at page 434, 30 L.Ed. 569): "In view of these authorities, it is clear that the statute of New York upon the subject of limitation does not affect the power and duty of the court below— following the settled rules of equity—to adjudge that time did not run in favor of defendants, charged with actual concealed fraud, until after such fraud was, or should with due diligence have been, discovered. Upon any other theory the equity jurisdic-

tion of the courts of the United States could not be exercised according to rules and principles applicable alike in every state. It is undoubtedly true, as announced in adjudged cases, that courts of equity feel themselves bound, in cases of concurrent jurisdiction, by the statutes of limitation that govern courts of law in similar circumstances, and that sometimes they act upon the analogy of the like limitation of law. *But these general rules must be taken subject to the qualification that the equity jurisdiction of the courts of the United States cannot be impaired by the laws of the respective states in which they sit.*" [35a] We see nothing to indicate that the doctrine of the Kirby case has been over-ruled or modified by Erie R. Co. v. Tompkins.

Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 532, 84 L.Ed. 754, decided since the Tompkins case, was a suit in equity, brought in a federal district court in New York to enforce the individual liability of shareholders of a Federal Joint Stock Land Bank. The defendant argued that the action was barred by the New York 3-year statute of limitations relating to suits to enforce liabilities of stockholders. The court held that the suit was one exclusively of "equitable cognizance, in that it is not predicated upon any legal cause of action," and that, as the New York courts had decided that the 3-year statute did not apply to such an equity suit, it did not govern in the federal courts. As the only New York limitations provision applicable to such an equity action was the ten-year statute and as less than ten years had run, the Court said that it had no occasion to consider the question before us in the instant case. But, in the course of its opinion, the Court reviewed the previous de-

---

[34] Guffey v. Smith. 237 U.S. 101, 35 S. Ct. 526, 530, 59 L.Ed. 856. There the Court said: "By the legislation of Congress and repeated decisions of this court it has long been settled that the remedies afforded and modes of proceeding pursued in the Federal courts, sitting as courts of equity, are not determined by local laws or rules of decision, but by general principles, rules, and usages of equity having uniform operation in those courts wherever sitting. Rev.Stat. §§ 913, 917 [28 U.S.C.A. §§ 723, 730]; Neves v. Scott, 13 How. 268, 272, 14 L. Ed. 140, 142; Payne v. Hook, 7 Wall. 425, 430, 19 L.Ed. 260; Dodge v. Tulleys, 144 U.S. 451, 457, 12 S.Ct. 728, 36 L.Ed. 501, 503; Mississippi Mills v.

Cohn, 150 U.S. 202, 204, 14 S.Ct. 75, 37 L.Ed. 1052, 1053. As was said in the first of these cases, 'Wherever a case in equity may arise, and be determined, under the judicial power of the United States, the same principles of equity must be applied to it, and it is for the courts of the United States, and for this court in the last resort, to decide what those principles are, and to apply such of them to each particular case as they may find justly applicable.' "

[35] Cf. the conflict of laws doctrine that statutes of limitation, in general, pertain to procedure. Goodrich, Conflict of Laws (1927) 168.

[35a] Emphasis added.

cisions, saying that, though not regarding themselves as bound by state statutes of limitations, federal equity courts will nevertheless, when *"consonant with equitable principles,"* [36] adopt as their own a local statute of limitations applicable to similar equitable causes of action; that when the equitable jurisdiction of the federal court is concurrent with that at law, or when the suit is brought in aid of a legal right, equity will withhold its remedy if the legal right is barred by the local statute; and that where the equity jurisdiction is exclusive, state statutes barring actions at law, are inapplicable. In its discussion, the Court made the following significant comment (309 U.S. 288, 60 S.Ct. 531, 84 L.Ed. 754, note 1): "But federal courts of equity have not always held themselves bound to follow local statutes which, in ordinary circumstances, they could adopt and apply by analogy. In each case the refusal has been placed upon the ground of *special equitable doctrines, making it inequitable to apply the statute. * * * Federal courts of equity have not considered themselves obligated to apply local statutes of limitations when they conflict with equitable principles, as where they apply, irrespective of the plaintiff's ignorance of his rights because of the fraud or in-* equitable conduct of the defendant."* (Citing, inter alia, the Kirby case.) [37]

That the doctrine of federal court independence concerning equitable "remedial rights" is distinct and apart from that of Swift v. Tyson, which Erie R. Co. v. Tompkins over-ruled, clearly appears from the fact that Mr. Justice Brandeis, the arch enemy of Swift v. Tyson, enthusiastically endorsed the "remedial rights" doctrine in Pusey & Jones Co. v. Hanssen, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763,[38] which cited with approval Guffey v. Smith, 237 U.S. 101, 114, 35 S.Ct. 526, 59 L.Ed. 856, one of the leading cases upholding that doctrine.[39] Mr. Justice Holmes who, in Kuhn v. Fairmont Coal Co., 215 U.S. 349, 370, 30 S.Ct. 140, 54 L.Ed. 228, had sharply criticized Swift v. Tyson, five years later concurred in Guffey v. Smith, and eight years after that decision concurred in Pusey & Jones Co. v. Hanssen, supra.[40] That Mr. Justice Brandeis in no wise objected to the extension of the "remedial rights" doctrine to state limitations statutes appears from his opinion, for the Court, in Benedict v. City of New York, 250 U.S. 321, 327, 328, 39 S.Ct. 476, 478, 63 L.Ed. 1005, where he cited the Kirby case with approval.[41] We find it impossible to believe that, speaking for the

---

[36] Emphasis added.

[37] Emphasis added.

[38] In Pusey & Jones Co. v. Hanssen, an unsecured creditor, who filed a bill in a federal court seeking the appointment of a receiver for a corporate debtor, relied on a state statute which expressly authorized such an action. The Court, in explaining why such relief must be refused despite the state statute, reviewed the previous decisions and gave a masterful exposition of the distinction between substantive and equitable remedial rights.

[39] See also Shapiro v. Wilgus, 287 U.S. 348, 356, 53 S.Ct. 142, 77 L.Ed. 355, 85 A.L.R. 128, in which Brandeis, J., concurred.

[40] That these concurrences cannot be explained as a subsequent acquiescence in Kuhn v. Fairmont Coal Co. appears from the fact that, thirteen years after Guffey v. Smith he again, in his dissenting opinion in Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 276 U.S. 518, 532, 48 S.Ct. 404, 72 L.Ed. 681, 57 A.L.R. 426, vigorously objected to the Swift v. Tyson doctrine. Brandeis, J., concurred in that dissent. Two years later, both those Justices concurred in Henrietta Mills v. Rutherford County, 281 U. S. 121, 127, 128, 50 S.Ct. 270, 74 L.Ed. 737, where the distinction between substantive and equitable "remedial" rights was reiterated and a state remedial statute was again ignored.

. [41] There, in a suit to enforce an express trust, he said: "Under the law of New York the alleged cause of action would have been subject, if not to the six-year statute of limitations (New York Code of Civil Procedure, § 382), then to the ten-year statute of limitations (New York Code of Civil Procedure, § 388), governing bills for relief in cases of the existence of a trust not cognizable by the courts of common law. Clarke v. Boorman's Executors, 18 Wall. 493, 21 L.Ed. 904. If the act of 1874 created an express trust, the statute of limitations would not begin to run until there had been a repudiation of the trust. [City of] New Orleans v. Warner, 175 U.S. 120, 130, 20 S.Ct. 44, 44 L.Ed. 96. Here there was an open repudiation of the trust duties which the plaintiff now seeks to enforce. And 17 years were allowed to elapse after that repudiation before this suit was begun and more than ten years before any attempt was made to secure some settlement by negotiation; and there clearly was no waiver of the

Court, he intended to over-rule Kirby v. Lake Shore & M. S. R. Co. and Pusey & Jones Co. v. Hanssen in Erie R. Co. v. Tompkins which nowhere mentions those cases or the doctrine which they embody.

Failure to observe the distinction between that doctrine and the Swift v. Tyson doctrine leads defendant to make the erroneous suggestion that in Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290 (decided a week after Erie R. Co. v. Tompkins) the court, by implication, held that the Tompkins case had obliterated the precedential value of cases like Kirby and that therefore the remarks of the Chief Justice in the later case of Russell v. Todd were in error, or, at best, "merely part of an historical conspectus" superfluously recalling abandoned precedents. In the Ruhlin case, the court vacated a judgment and remanded because, in a suit in equity, the lower federal court had, a la Swift v. Tyson, construed an "incontestability clause" of a life insurance policy according to "general" or "federal" law and not with reference to the law of the state in which the federal district court was located. Thus that case merely applied the Tompkins rule to substantive rights when involved in equity cases. The Court had no occasion to consider, and the opinion did not, therefore, discuss, the question whether, the substantive rights being settled according to state decisions, the federal court should grant equitable relief of a kind other than that granted in the state court.[42] Accordingly, it left untouched the settled doctrine as to equitable remedial rights; and, as no question of limitations was involved in Ruhlin, that case did not even intimate' that the matter of limitations was no longer to be regarded as affecting such remedial rights.[42] It is significant that, after the Ruhlin case, the Court, in Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 164, 59 S.Ct. 777, 83 L.Ed. 1184, cited with approval Robinson v. Campbell and other similar subsequent cases, and that later, in Kelleam v. Maryland Casualty Co., 312 U.S. 377, 381, 61 S.Ct. 595,

---

statute. While it is true that federal courts sitting in equity are not bound by state statutes of limitations (Kirby v. Lake Shore & M. S. R. Co., 120 U.S. 130, 7 S.Ct. 430, 30 L.Ed. 569), they are, under ordinary circumstances, guided by them in determining their action on stale claims (Godden v. Kimmell, 99 U.S. 201, 210, 25 L.Ed. 431; Philippi v. Philippe, 115 U.S. 151, 5 S.Ct. 1181, 29 L.Ed. 336; Pearsall v. Smith, 149 U.S. 231, 13 S.Ct. 833, 37 L.Ed. 713; Alsop v. Riker, 155 U.S. 448, 15 S.Ct. 162, 39 L.Ed. 218). Compare Sullivan v. Portland & Kennebec R. Co., 94 U.S. 806, 811, 24 L.Ed. 324. Between 1892 and 1905 plaintiff did nothing to enforce his alleged rights except to commence in 1893 a suit which he did not prosecute. His lack of diligence is wholly unexcused; and both the nature of the claim and the situation of the parties was such as to call for diligence. The lower courts did not err in sustaining the defense of laches."

[42] The same is true of New York Life Ins. Co. v. Jackson, 304 U.S. 261, 58 S.Ct. 871, 82 L.Ed. 1329; Rosenthal v. New York Life Ins. Co., 304 U.S. 263, 58 S.Ct. 874, 82 L.Ed. 1330; Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73; Wichita Royalty Co. v. City National Bank, 306 U.S. 103, 107; 59 S.Ct. 420, 83 L.Ed. 515; Cities Service Oil Co. v. Dunlap, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196; Fidelity Union Trust Co. v. Field, 311 U.S.

169, 61 S.Ct. 176, 85 L.Ed. 109; West v. American Tel. & Tel. Co., 311 U.S. 223, 236, 61 S.Ct. 179, 85 L.Ed. 139, 132 A.L.R. 956; Stoner v. New York Life Ins. Co., 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284; Griffin v. McCoach, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481, 134 A.L.R. 1462; Pecheur Lozenge Co. v. National Candy Co., 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103; and Meredith v. Winter Haven, 320 U.S. 228, 64 S.Ct. 7.

In D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 62 S.Ct. 676, 684, 86 L.Ed. 956, in a suit at law, the Court held that Erie R. Co. v. Tompkins was not applicable because the plaintiff was a federal corporation suing under a federal statute which provided that all suits to which that corporation was a party "shall be deemed to arise under the laws of the United States." The majority of the Court did not consider alternative grounds for its decision noted by Mr. Justice Jackson, i. e., that Erie R. Co. v. Tompkins did not apply because jurisdiction was not founded upon diversity of citizenship or perhaps because the defense of equitable estoppel might be considered "an equity matter" although the action was at law. That the majority of the Court did not rely upon the doctrine relating to remedial rights when "equitable estoppel" was involved is no indication that it obliterated that doctrine.

85 L.Ed. 899, the Court cited and followed Pusey & Jones Co. v. Hanssen.[43] Ettelson v. Metropolitan Life Insurance Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176, teaches that the new Rules have not obliterated the distinction between actions at law and suits in equity.

 It may be that equity jurisdiction in the instant case is exclusive and not concurrent. Which it is, must be determined not by New York but by federal decisions as to the federal equity jurisdiction existing at the time of the adoption of the Constitution or of the enactment of the Judiciary Act of 1789.[44] At that date, an action against a trustee for breach of trust seems to have been within the exclusive cognizance of equity.[45] And it would seem that the "jurisdiction" of such a suit is not to be regarded as "concurrent" for the purposes here under discussion, even if the beneficiary can sue at law.[46] Doubtless a trustee may make a contract imposing upon him legal obligations on which he may be sued on the "law side". But his obligations, qua trustee, are presumably still purely equitable in the federal courts, no matter how much he may modify them by contract.

 It is, however, of no moment whether here the "jurisdiction" is or is not exclusively equitable.[47] For the Kirby case (cited with approval in Benedict v. City of New York, supra, and Russell v. Todd, supra) was a case of concurrent jurisdiction, yet the Court held that, if the defendant's misconduct prevented the plaintiff from learning his rights, the New

---

[43] In Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, 233 (certiorari denied 317 U.S. 672, 63 S.Ct. 76, 87 L. Ed. 539) the Court said: "The rule of Erie R. Co. v. Tompkins being determinative of substantial rights, there is still preserved * * * a uniform basis for granting equitable remedies in cases in which substantive rights have arisen under state law."

[44] See, e. g., Mississippi Mills v. Cohn, 150 U.S. 202, 206, 14 S.Ct. 75, 37 L.Ed. 1052; Petroleum Exploration, Inc., v. Public Service Commission, 304 U.S. 209, 217, 58 S.Ct. 834, 82 L.Ed. 1294; Russell v. Todd, 309 U.S. 280, 286, 60 S. Ct. 527, 84 L.Ed. 754; Stratton v. St. Louis S. W. R. Co., 284 U.S. 530, 533, 52 S.Ct. 222, 76 L.Ed. 465; Matthews v. Rodgers, 284 U.S. 521, 529, 52 S.Ct. 217, 76 L.Ed. 447; Gordon v. Washington, 295 U.S. 30, 37, 55 S.Ct. 584, 79 L.Ed. 1282; Waterman v. Canal-Louisiana Bank & Trust Co., 215 U.S. 33, 43, 30 S.Ct. 10, 54 L.Ed. 80; Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 163, 164, 59 S.Ct. 777, 83 L.Ed. 1184; State of Pennsylvania v. Wheeling & Belmont Bridge Co., 13 How. 518, 563, 14 L.Ed. 249; Payne v. Hook, 7 Wall. 425, 430, 19 L.Ed. 260; cf. Rules of Equity Practice, 7 Wheat. xvii, Rule xxxiii.

Of course, Congress can change the scope of the equity jurisdiction; Sprague v. Ticonic Nat. Bank, supra.

[45] See 3 Halsbury's Laws of England (2d ed.) 305.

See also Alexander v. Hillman, 296 U. S. 222, 239, 56 S.Ct. 204, 80 L.Ed. 192; Clews v. Jamieson, 182 U.S. 461, 479, 21 S.Ct. 845, 45 L.Ed. 1183; 1 Pomeroy, Equity Jurisdiction, 654–687.

[46] The mere fact that the claim against a trustee is for money does not render the jurisdiction concurrent. See, e. g., Taylor v. Benham, 5 How. 233, 12 L.Ed. 130; Bay State Gas Co. v. Rogers, C.C., 147 F. 557, 560, 561.

The Restatement of Trusts, § 197, says that "except as stated in § 198, the remedies * * * are exclusively equitable"; the remedies described in § 198 do not include a suit to "compel the trustee to redress a breach of trust" which is included, as an "equitable" remedy in § 199 (c); and § 201 defines a breach of trust as a violation of "any duty" which the trustee "owes to the beneficiary."

In Miles v. Vivian, 2 Cir., 79 F. 848, the trustee was found guilty of negligence. The Court held that jurisdiction in equity as to such a breach of duty was concurrent and that therefore the statute of limitations would apply, especially as the plaintiff had long slept on his rights and showed no excuse for having done so. In Frismuth v. Farmers' Loan & Trust Co., 2 Cir., 107 F. 169, again the action was for negligence on the part of the trustee. Here the basis of the action is not negligence but knowing failure to act where the trustee had a conflicting interest and plaintiff has not slept on her rights.

[47] That if the suit is of exclusively equitable cognizance the federal court will, when equitable considerations exist, disregard a state statute specifically applicable thereto, see cases cited in Russell v. Todd, 309 U.S. at page 288, 60 S.Ct. at page 531, 84 L.Ed. 754, note 1, such as Alsop v. Riker, 155 U.S. 448, 15 S. Ct. 162, 39 L.Ed. 218; Patterson v. Hewitt, 195 U.S. 309, 318, 25 S.Ct. 35, 49 L.Ed. 214; Kelley v. Boettcher, 8 Cir., 85 F. 55, 62.

York statute of limitations should be disregarded. Accordingly, whether the equity jurisdiction is exclusive or concurrent, the court, where the defendant is guilty of "inequitable conduct" causing plaintiff's ignorance of his rights, will toll the statute. In all the cases cited in Russell v. Todd, in which, where the equity jurisdiction was concurrent, the Court applied the local limitations statute,[48] either (a) there was no showing whatever of any inequitable conduct of the defendant accounting for plaintiff's ignorance of his rights or (b) the plaintiff, after becoming aware of his rights, slept on them.[48a]

Nor is it true, as defendant contends, that the federal courts have applied the Kirby doctrine only in order to shorten the time within which the claim is barred because a plaintiff delays his suit without excuse. The opinion in the Kirby case itself shows that the rule has not been so limited as to favor only defendants, but works both ways.[49] See also Van Devan-

---

[48] Wilson v. Koontz, 7 Cranch 202, 3 L.Ed. 315; Stearns v. Page, 7 How. 819, 830, 831. 12 L.Ed. 928; Clarke v. Boorman's Ex'rs, 18 Wall. 493, 505, 507, 21 L.Ed. 901; Carrol v. Green, 92 U.S. 509, 23 L.Ed. 738; Godfrey v. Terry, 97 U.S. 171, 175. 24 L.Ed. 944: Baker v. Cummings, 169 U.S. 189, 206, 207. 18 S.Ct. 367, 42 L.Ed. 711; Metropolitan Nat. Bank v. St. Louis Dispatch Co., 149 U. S. 436, 448, 449, 13 S.Ct. 944, 37 L.Ed. 799; Wood v. Carpenter, 101 U.S. 135, 25 L.Ed. 807; Hughes v. Reed, 10 Cir., 46 F.2d 435; Wagner v. Baird, 7 How. 234, 12 L.Ed. 681; Godden v. Kimmel, 99 U.S. 201. 25 L.Ed. 431; See also Speidel v. Henrici, 120 U.S. 377, 7 S.Ct. 610. 30 L.Ed. 718: Curtis, Receiver, v. Connly, 257 U.S. 260, 261, 42 S.Ct. 100, 66 L. Ed. 222.

[48a] In Roos v. Texas Co., 5 Cir., 126 F.2d 767, there was no showing of plaintiff's "ignorance of his rights because of the fraud or inequitable conduct of the defendant" and the opinion discloses that plaintiff was clearly chargeable with laches.

In Shultz v. Manufacturers & Traders Trust Co., 2 Cir., 128 F.2d 889, 896, we held the New York limitations statute to be applicable to a suit for damages, accounting and other relief for an alleged conspiracy and fraud in defendant's acquisition of stock from plaintiff's decedent. But there the trial court had made explicit findings, which a majority of this court held amply supported by the evidence, that the decedent had known, or reasonably should have known, all the facts at or about the time of the alleged wrongdoing. True, our opinion stated that "no ground was shown * * * for purely equitable relief," and, in that connection, relied not on federal but on New York decisions, and the opinion also said that in Russell v. Todd the court "was ready to accept an explicit applicable state statute to a suit of exclusively equitable cognizance." As the plaintiff, on the findings, was there chargeable with the grossest delay, those portions of our opinion were in no way necessary to the decision, and we do not feel bound by them here where the facts are very substantially different. See Cohens v. Virginia, 6 Wheat. 264, 399, 5 L.Ed. 257; Taylor v. Voss, 271 U.S. 176, 184, 46 S.Ct. 461, 70 L.Ed. 889; Weyerhaeuser v. Hoyt, 219 U.S. 380, 394, 31 S.Ct. 300, 55 L.Ed. 258.

The doctrine of those cases last cited applies to Union Mutual Life Ins. Co. v. Friedman, 2 Cir., 139 F.2d 542. There we held that, in a suit for recovery of moneys paid out because of defendant's fraudulent misrepresentations, defendant could not be deprived of a jury trial by treating the suit as one in equity. We said that it was not sufficient that the New York statute of limitations might bar recovery at law and might not in equity. As the record in that case shows, the facts were such that the effect of the statute was the same at law or in equity, i. e., the statute in any event did not run until the discovery of the fraud.

[49] In the frequently cited case of Kelley v. Boettcher, 8 Cir., 85 F. 55, 62, Judge Sanborn said: "In the application of the doctrine of laches, the settled rule is that courts of equity are not bound by, but that they usually act or refuse to act in analogy to, the statute of limitations relating to actions at law of like character. * * * The meaning of this rule is that, under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after the time fixed by the analogous statute of limitations at law; but if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it."

Cf. Cooper v. Hill, 8 Cir., 94 F. 582, 589–591; Chiswell v. Johnston, 55 App. D.C. 3, 299 F. 681, 688; Johnston v. Roe, C.C., 1 F. 692; Tice v. School-

ter, J., in Stevens v. Grand Central Mining Co., 8 Cir., 133 F. 28, 32;[50] Sanborn, J., in Wilson v. Plutus Mining Co., 8 Cir., 174 F. 317, 320, 321.

■ It follows that, while we are bound by the interpretation which New York decisions give to the trust indenture, we are not required to apply the New York statute of limitations if there are strong countervailing equitable considerations. On the facts now before us, we cannot say that defendant's conduct, which apparently led to plaintiff's ignorance of her rights, was not clearly "inequitable."

We conclude, then, that we cannot sustain the summary judgment on the ground that the action was barred by limitations or laches.[51]

■■ 12. Plaintiff prayed for relief on behalf of herself and all similarly situated noteholders. Defendant, on this appeal, urges that no such relief can be granted. Although that issue will not directly arise unless and until the trial court decides that defendant wrongfully caused a loss to non-accepting noteholders, we think it well, in the light of the protracted history of this litigation and the fact that the question has been argued before us, to indicate our views.

Rule 23(a) reads as follows: "If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is (1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it; (2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or (3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought." The complaint adequately states the common interest of all the non-accepting noteholders and that they are so widely scattered as to make it too expensive to join them all as parties.[52] On the facts alleged, all non-accepting noteholders suffered losses through a common breach of trust consisting of improper non-action by their common trustee. To be sure, the trustee may perhaps be able to show, as a defense, that, even if some of these noteholders had not sufficient knowledge of the facts, others who may intervene were aware of those facts, so that their loss did not flow from the trustee's inadequate disclosure. But such facts, if proved, will be by way of defense.[53] The claims here are not individualized fraud claims based upon individual misrepresentations. This action may, therefore, be maintained as a class suit under Rule 23(a) (3).[54]

■ But it is obvious that such a ruling may be purely academic and lack all practical significance unless any other note-

---

District, C.C.D.Neb., 17 F. 283; Johnson v. White, 8 Cir., 39 F.2d 793, 798.

[50] Cited with approval in Russell v. Todd, supra.

[51] Plaintiff alleges that, when she first learned of the cause of action she tried to intervene in Hackner v. Guaranty Trust Co. That attempted intervention, although based on an erroneous theory, was enough to rebut laches. Southern Pacific Co. v. Bogert, 250 U.S. 483, 490, 491, 39 S.Ct. 533, 63 L.Ed. 1099; cf. New York Cent. & H. R. R. Co. v. Kinney, 260 U.S. 340, 346, 43 S.Ct. 122, 67 L.Ed. 294; United States v. Memphis Cotton Oil Co., 288 U.S. 62, 68, 69, 53 S.Ct. 278, 77 L.Ed. 619; Maty v. Grasselli Chemical Co., 303 U.S. 197, 200, 201, 58 S.Ct. 507, 82 L.Ed. 745.

[52] After the case is remanded, the defendant, of course, may, if it sees fit, traverse these allegations and try to show that plaintiff does not adequately represent the absent noteholders. However, this should be noted: The plaintiff does not need to include the claims of others in order to maintain federal jurisdiction. As the suit comes within Rule 23(a) (3), so that a judgment will not be res judicata as to noteholders who do not intervene, there is no necessity for a searching inquiry concerning the adequacy of her representation of others in the class.

[53] The defendant may have other defenses against specific intervenors.

[54] In Hackner v. Guaranty Trust Co., 2 Cir., 117 F.2d 95, Hackner and the other noteholder plaintiffs (except York who was dismissed as plaintiff) had accepted the offer, alleging that they had been induced by misrepresentations to part with their notes and had thereby suffered losses. As each such accepting noteholder, in order to recover, needed to show that he, individually, had acted in reliance on alleged misrepresentations, we held that, for purposes of establish-

holder who intervenes will, for purposes of the defense of laches, have the benefit of the date when plaintiff attempted to intervene in Hackner v. Guaranty Trust Co.[51a] Before the new Rules, that question seems not to have been considered as to suits of the kind now described in 23(a) (3), but it was several times answered in favor of intervenors in class suits of the character now described in 23 (a) (1) and (2). Richmond v. Irons, 121 U.S. 27, 54, 7 S.Ct. 788, 30 L.Ed. 864; Marsh v. United States, 4 Cir., 97 F.2d 327, 330; Newgass v. Atlantic & D. R. Co., C.C., 72 F. 712, 716: Dobson v. Simonton, 93 N.C. 268, 271-273.[55] In the case last cited, the court said: "It would be a strange anomaly in the law, if it should allow an action to be brought for a party, and he should thus be encouraged to rely upon it, and not seek legal redress otherwise than by it, and yet when he came, in the course of his action, to prove his debt, and share in the fund, to treat him as having, by such reliance, lost it by the lapse of time, happening after the bringing of the action. The law will not mislead—it is just and faithful, and will not tolerate, much less uphold, a rule of practice that works such injustice and absurdity." We think those comments are apposite here. We agree with Deckert v. Independence Shares Corp., D.C., 39 F.Supp. 592, 597[56] —seemingly the only case discussing the problem, and one which is cited and quoted with apparent approval in 2 Moore, Federal Practice, 1942 Supplement, p. 99[57]— that Rule 23(a) makes no differentiation, for purposes of limitations (and therefore of laches), between class suits under (1), (2) and (3). As to suits under (3), no less than those under (1) or (2), the Rule unequivocally tells all persons having claims of the type therein described that one or more of them may begin such a class action "on behalf of all" when the "class" is "so numerous as to make it impracticable to bring them all before the court." Any non-accepting noteholders, relying on that assurance, were justified in believing that plaintiff's suit was begun on their behalf although they were not before the court. To hold that such noteholders cannot, as to lapse of time, have the benefit, by intervention, of the institution of the suit by plaintiff would be to convert the Rule into a trap. Since, in a class suit under clause (3), a judgment will not be res judicata for or against those of the class who do not intervene, we suggest that if, after trial, the court finds against the defendant, appropriate steps be taken to notify all such noteholders to intervene (if they have not theretofore done so), judgment to be entered in favor only of those who do so within a reasonable time. Those who do intervene will be no more barred by lapse of time than is the plaintiff, unless defendant can prove special facts affecting them.

Reversed and remanded.

AUGUSTUS N. HAND, Circuit Judge (dissenting).

Upon reconsideration of this case on the petition for rehearing, I have become

---

ing the requisite jurisdictional amount, the claims of the several plaintiffs could not be aggregated. Cf. Central Mexico Light & Power Co. v. Munch, 2 Cir., 116 F.2d 85, 89. For the Rules could not affect basic jurisdictional requirements fixed by statute. But there were no similar inhibitions as to changes affecting loss of rights through lapse of time, as indicated by Rule 60(b).

[54a] See footnote 51a. The complaint in that suit, brought by accepting noteholders, prayed relief on behalf of all others similarly situated. Her intervention should be deemed to have adopted that prayer vis a vis non-accepting noteholders.

[55] Cf. Southern Pacific Co. v. Bogert, 250 U.S. at pages 489, 490, 39 S.Ct. at page 536, 63 L.Ed. 1099.

[56] There the court, considering the suit, in the alternative, either as under 23(a) (2) or (3), held that there was no difference in this respect.

[57] The same discussion (relating to intervention under Rule 24) appears in Moore's 1943 Supplement, page 105. Earlier, in 1938, before the Deckert case, Moore, in his comments on dismissal of class actions under Rule 23(c), had expressed a different view (Volume 2, page 2280, note 11); however, in his 1943 Supplement, page 84, in his annotation to that earlier comment, he makes a cross-reference to his more recent discussion of the Deckert case.

As Moore states, that decision was reversed "on other grounds" in Pennsylvania Co. for Insurances, etc., v. Deckert, 3 Cir., 123 F.2d 979. There, as to limitations, the court, as we read its opinion, held merely that, in a clause (3) suit, the claim of an intervenor is barred if, before the institution of that suit, the statute had run against his claim.

convinced that we seriously erred in our original decision. I can see no reason to suppose that the Guaranty Trust Company was guilty of a breach of any fiduciary relation which it assumed under the trust indenture.

In Article Four, Section 22, dealing with "Remedies on Default," the trust indenture provided that in the event of any of the defaults enumerated " * * * the Trustees may, and upon the written request of the holders of at least twenty-five per cent in principal amount of the notes then outstanding, shall, declare the principal of all the notes then outstanding to be due and payable immediately, and upon any such declaration the same shall become and be due and payable immediately, anything in this indenture or in the notes contained to the contrary notwithstanding." In Article Seven, Section 33, the indenture provided that: "The Trustee shall not be answerable for * * * anything whatever in connection with this trust except for its own wilful misconduct"; also that: "Anyone holding the office of Trustee hereunder may from time to time purchase, acquire, hold, own and deal in any of the notes and may assert its rights in respect thereof in the same manner as any other noteholder hereunder. The Trustee or any company in which it or its stockholders may be interested or affiliated, or any officer or director of the Trustee or of any such company, may acquire and hold any of the notes and coupons, or may engage in or be interested in any financial or other transaction with the Company or any corporation in which the Company may be interested * * *."

Under the foregoing provisions there was no duty on the part of the trustee to declare or to procure a default, even though it might hold an adverse interest, as a creditor of the debtor, to some of the noteholders. The indenture gave the trustee the right to become a creditor. To procure a general liquidation by declaring a default would have been in the interest of no one connected with the enterprise, for all of the noteholders would have been likely to obtain less for their claims than by proceeding with the 50% plan offered by the debtor at the instigation of the trustee. It is doubtless true that the trustee could not refrain from exercising any right it had to declare a default in order to secure an advantage to itself at the expense of the noteholders. But I think

there is no reason to suppose that it did refrain for any such reason. If it had not promoted the making of the 50% offer to the noteholders and had allowed matters to drift and the debtor to continue to purchase the notes at 50 cents on the dollar or less, as it was doing, the lending banks, of which the trustee was one, would have received some $7,500,000 of cash from Vaness instead of the relatively trifling sum which came to them out of the balance of moneys arising from the failure of the non-assenting noteholders to accept the offer. That it arranged to have the 50% offer made and thus sought to protect the interests of the noteholders showed its honest purpose. It seems impossible to suppose that a plan which yielded the banks only $106,000, and that because the non-assenting noteholders declined to accept it, was entered into in order that the banks should make money at the expense of any of the noteholders. I can see no duty to declare a default merely because the trustee, as a lender, had an interest in not having a default declared. The trust instrument gave the trustee the right to become such a lender and yet explicitly made the exercise of the power to declare a default permissive and discretionary. The Guaranty Trust Company was acting for the noteholders as a whole and if liquidation rather than acceptance of the plan would injure all of them, I can see no obligation to liquidate to the injury of the majority merely because some noteholders failed to accept when acceptance was to their advantage as well as to that of all the other noteholders and the lending banks. I do not think that a disclosure of the loans which the trustee was permitted to make under the trust indenture was either necessary or relevant to the only problem the non-accepting noteholders had which was whether or not to accept an offer that the debtor correctly advised them was to their advantage. To justify the plaintiff's claim on the merits we must regard the promotion of the 50% offer, the trustee's procurement of an extension of time to accept it beyond the original acceptance date, and the acceptance of the offer by 96% of the noteholders, as insufficient to show good faith on the part of the trustee. I think these factors negative any inference that the failure of the trustee to give explicit information as to the probability of serious loss to non-acceptors was in the hope that noteholders would re-

fuse to accept and thus bring some advantage to the lending banks.

But aside from any question as to the merits of plaintiff's claim, I see no sufficient reason for not holding it barred by the New York statute of limitations, under which claims like the one sued on here would be barred if not asserted within ten years after they had accrued. Since the rule announced in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, and Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290, became law, I think the situation is most rare when we should disregard the local statute of limitations because the proceeding is equitable. This seems implicit in the decision in Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 84 L.Ed. 754, and while, because of the footnote to the opinion found at page 288 of 309 U.S., at page 531 of 60 S.Ct., it seems probable that equitable claims may be asserted in extreme situations even if the local statute of limitations has expired, I cannot believe that the present is such an occasion. Any fault here lay in the omission of the trustee to warn the plaintiff of the loss she would incur if she failed to accept the debtor's offer. That I regard as at most an act of negligence which was something far different from a deliberate concealment in order to prevent the non-accepting noteholders from bringing suit. The plaintiff here must have known she had suffered a loss which she would not have suffered if she had accepted the offer. She also was bound to know that the trustee had a right to have an interest either as a noteholder or lender in the assets of the debtor and its subsidiaries. Yet she took no steps to discover and assert any rights she had for more than ten years. In such circumstances I can see no reason for extending any indulgence to the plaintiff beyond the period of the New York statute of limitations. In my opinion it would be a mischievous practice to disregard state statutes of limitation whenever federal courts think that the result of adopting them may be inequitable. Such procedure would promote the choice of United States rather than of state courts in order to gain the advantage of different laws. The main foundation for the criticism of Swift v. Tyson was that a litigant in cases where federal jurisdiction is based only on diverse citizenship may obtain a more favorable decision by suing in the United States courts. The exercise of a wide discretion as to whether to apply the state statutes of limitation would tend to promote the assertion of moral superiority on the part of the federal courts since they would be setting up rules of limitation which they would regard as more equitable than those of the state courts in situations where neither Congress nor the Federal Rules of Civil Procedure have prescribed limitations of their own. Moreover, any such practice will give rise to a new and difficult class of cases in which the United States courts in dealing with equitable claims will have to determine whether the rule to be applied is one of substantive law or of remedial rights.

In view of the foregoing I think we should hold that the plaintiff's claim is not established on the merits and that in any event it is barred by the New York ten year statute of limitations. Accordingly the judgment of the court below should, in my opinion, be affirmed.